# Richmond

## Franklin D. Robins v. S. T. Massey.

January 19, 1942.

Record No. 2468.

Present, All the Justices.

The opinion states the case.

*James W. Gordon* and *Norman L. Flippen*, for the appellant.

*Alexander H. Sands* and *William C. King*, for the appellee.

HOLT, J., delivered the opinion of the court.

The parties to this suit in the lower court were S. T. Massey, plaintiff, versus Luther C. Jones, Franklin D. Robins, Jones & Robins, Incorporated, The Central National Bank, Massey Builders Supply Corporation and S. T. Massey, President, Robert G. Frye, Vice President and Franklin D. Robins, Secretary-Treasurer, defendants.

A casual inspection of the record would seem to indicate that title to ten shares of stock in the Massey Builders Supply Corporation is the main matter at stake, but beyond its book or market value, the power to control this corporation is also involved.

S. T. Massey and Luther C. Jones, his brother-in-law, effected the organization of this corporation in 1925. Business was begun on January 1, 1926, with Mr. Massey as president and general manager. He still is. Following its organization it was highly successful. Dividends up to and through 1930 varied from 30% to 35%. From 1931 to 1935, inclusive, none were paid. 6% was declared in 1936, 10% in 1937 and 10% in 1938.

This suit was instituted in September, 1939. The joint answer of Franklin D. Robins, Luther C. Jones and Jones & Robins, Incorporated, and the cross bill of Jones & Robins, Incorporated, were filed on November 29, 1939. On the same day Franklin D. Robins filed his cross bill. The taking of evidence, all of which is in the form of depositions and exhibits, was commenced on November 30, 1939, and was concluded on June 7, 1940.

In 1930 Massey, Jones and Robins concluded that they would purchase jointly as much of the corporation's outstanding capital stock as possible. To accomplish this they borrowed from the Central National Bank of Richmond, $15,500, which fund, together with $9,500 from other sources, was so used. As collateral for the bank loan Massey pledged 55 shares of stock, Jones 50 and Robins 50. The bank note was signed by Robins and endorsed by Jones and Massey. It was curtailed from time to time and was finally paid in full in 1938. At that time the balance due thereon was $200, and payments were made one-third by Massey, one-third by Jones and one-third by Robins.

Massey's payments were made through Robins, who, in turn, made them to the bank. When the bank's debt was paid, the bank, as might have been expected, turned over to Robins the note with its supporting collateral. In the original note and its renewal Robins appears to have been the maker, and Massey and Jones, who were in fact joint obligors, appeared as endorsers. The bank, when final payment was made, in the ordinary course of business turned over this collateral to its maker, Robins, among which was Massey's certificate for 55 shares.

In January, 1932, it appeared from an audit of the company's affairs that Massey had improperly withdrawn from it approximately $10,000. A settlement was reached between him and the corporation by which he surrendered to it 52 shares of capital stock owned by him and not pledged to the bank.

The agreed value at which this stock was taken in was $7,020. Upon final settlement, Massey still owed to the corporation $1,865.99 as his part of the overdraft, for which Massey gave his note, which note, according to Massey's testimony, was but a memorandum because he did not sign it. Had it been paid, it would have been paid to the corporation, for it represented the amount still due by Massey to it. Afterwards, due to subsequent withdrawals of merchandise, Massey's indebtedness to the corporation amounted to $2,942.53, for which he executed his note of date December 31, 1936, made up in part of the $1,865.99 item.

At a directors' meeting held on December 31, 1938, this resolution was adopted:

"Upon motion of L. C. Jones and seconded by R. G. Frye, S. T. Massey is authorized to cause his debit balance of $2,942.53 to be charged off as a bad debt."

The minutes of the corporation authorizing it were not signed by either Mr. Massey as president or Mr. Robins as Secretary. Obviously it should not have been treated as a bad debt, for Massey was a salaried officer of his company. His salary for the years 1926, 1927 and 1928 was $250.00 a month. In 1929 it was $400.00. Afterwards it was reduced to $250.00 a month and later increased to $325.00 a month.

In this state of affairs and under the advice of the corporation's auditor this resolution was presented and adopted:

"Whereas, Mr. S. T. Massey has served this corporation, its officers and directors faithfully in the capacity of president of this corporation; and,

"Whereas, in the beginning of the depression Mr. Massey's salary was reduced approximately fifty per cent. and he has served the corporation at a tremendous personal sacrifice

financially during the depression and also because business until recently has not justified the payment to him of his original compensation, it is the intent of this meeting that the following is approved and on motion of Mr. L. C. Jones and seconded by Mr. R. G. Frye,

"Therefore, be it resolved, that this board of directors do authorize Mr. S. T. Massey, president of the Massey Builders Supply Corporation, to draw a check payable to himself in the sum of Two Thousand Nine Hundred Forty-Two Dollars and Fifty-Three cents ($2,942.53), said sum being in recognition of services rendered as mentioned above."

The minutes of the corporation showing its adoption were signed by Mr. Massey but not by Mr. Robins. Mr. Massey has testified how this came about:

"I took it down to Mr. Robins and explained what Mr. White had told me about charging it off as a bad account. Mr. Robins said he would be glad to go over it and would bring it up at the next meeting. He kept the minute book and also the resolution. He said he would go over it and bring it up at the next meeting, which was in about ten days. At that particular meeting Mr. Robins forgot the minute book; therefore we suspended the reading of the minutes containing this resolution. At the next meeting he brought the book, but made no mention of the resolution at all, and has never been mentioned at all until this controversy arose. In the meantime, I reported this in my income tax report as a bonus and paid taxes thereon."

In any event nothing further has been done about it, and this claim against Massey has been treated as settled.

Mr. Massey thought that it would benefit his corporation if the active interest of Mr. John L. Livers of Charlottesville in it could be secured. Mr. Livers was a banker and an officer in a cement company. A simple means to this end would be to have Livers become a stockholder. With this in view he sought to interest him in the purchase of stock but all of his stock, 55 shares, was, as we have seen, deposited as collateral to secure the $15,500 loan. Any at-

tempt to have the bank release Massey's stock, or any part of it, might possibly excite the bank's suspicion and cause it to call its loan; from which it followed that any stock which might be sold to Livers had to be secured from elsewhere.

We are to determine if the ten shares afterwards sold Livers was sold by Robins through Massey to Livers or loaned by Robins to Massey and by Massey sold to Livers, as his, Massey's stock. This was in the early part of 1932. Jones and Robins have both testified as to the character of their contract with Massey. Mr. Jones said:

"Mr. Robins suggested that he had ten shares of the Massey Builders Supply Corporation stock unencumbered, and he thought it was specially advantageous to the company to have Mr. Livers as a stockholder, and that he would be very glad to loan Mr. Massey this stock in order to put through the sale. It was then—* * * agreed upon, conditioned upon Mr. Massey turning over to Mr. Robins the $1,350 in cash, the proceeds from the sale of this stock, with the understanding that Mr. Robins was to use this money, and in lieu thereof Mr. Massey was to collect any dividends that might be distributed on the stock, until such time as the note was paid out in the Central National Bank, at which time Mr. Massey was to deliver back to Mr. Robins the ten shares of his stock."

This is Robins' account of their dealings:

"During the discussion the question was brought up as to how Mr. Massey could deliver the ten shares of stock—ten shares of his fifty-five shares of stock as we would have to disturb our note in the Central National Bank and at that time the banks were very energetic in calling everybody who could pay and if they thought they could pay they would make them pay. So I suggested to Mr. Massey that I had ten shares of unencumbered stock that I would lend him and that he was to turn over to me the proceeds from the sale of the stock, which was $1,350, and he in turn would get the dividends, to which he agreed. So several days later Mr. Massey called me over the phone and said: 'Mr.

Frank, John Livers is in town today, and he wants to get that ten shares of stock,' and he says: 'When you all come up here tonight bring the certificate.' So that night Mr. Jones and I went up to the office of Massey Builders Supply Corporation and I carried along the certificate of stock and we transferred the certificate to Mr. Livers. I suggested to Mr. Jones after we got up there that he write the certificate in his own handwriting as he wrote a better hand than I, which he did. That was on the 18th of March. So, several days later Mr. Massey called me on the phone and said: 'Mr. Frank, I have got that check from Mr. Livers and I will send you a check down for it.' So he sent me a check of Massey Builders Supply Corporation for $1,350, which I credited to my account. In July of this year I made a special trip to Mr. Massey's office one night and when I got there nobody was there but him and during my discussion I said to Mr. Massey: 'S. T., am I or am I not entitled to my ten shares of stock that I loaned you?' His reply was: 'You are entitled to it, but you are not now entitled to it.' I *ask:* 'Why am I not entitled to it?' His reply was: 'The stock has gone up. If the stock had gone down, you would not now want it.' So my reply to him was: 'I still think I am entitled to it.' "

In 1937, Mr. Massey sent to Jones & Robins, Incorporated, this statement, upon which petitioner strongly relies:

"S. T. Massey

Account with Jones & Robins, Inc., Richmond, Virginia.

DEBITS:

| | | | |
|---|---|---|---|
| Jan. | 1932— | | |
| Apr. | 1933 | Total charges 3902 W. Franklin St.........$ | 624.28 |
| Mar. | 1932 | Balance on cost of garages............... | 154.77 |
| Mar.-Sept. | 1932 | Miscellaneous charges .................... | 39.58 |
| Dec. | 1933 | Commission in rent collected (Rose and McKenzie) .................. | 9.87 |
| Mar. | 1932— | | |
| Feb. | 1937 | Central National Bank charges.......... | 3,376.91 |

Total charges ....................... $4,205.41

CREDITS:

| | | | | |
|---|---|---|---|---|
| Oct. | 1931 | Cr. balance on 3902 W. Franklin St.......$ | 77.15 | |
| Dec. 22, 1931 | | Check of self............................ | 381.36 | |
| Apr. | 1933 | Rents 3011 W. Grace St................. | 1,427.00 | |
| | | Central National Bank credits........... | 1,107.78 | $2,993.29 |

$1,212.12

Interest at 6% on monthly balances charged by
Jones & Robins, Inc.:

| | | |
|---|---|---|
| Year 1932 | ........................................... | 136.91 |
| " 1933 | ........................................... | 41.93 |
| " 1934 | ........................................... | 67.79 |
| " 1935 | ........................................... | 87.77 |
| " 1936 | ........................................... | 85.83 |
| 2 Mos. 1937 | ........................................ | 16.36 | 436.59 |

Total Balance due as shown by
Jones & Robins, Inc. ......................... $1,648.71

Less credits due S. T. Massey:

Interest on $1,350.00 check dated 3/21/32 6% for 5 years.   405.00
Interest on $1,427.00 rents collected April 1, 1932 6%
     for 4 years, 11 mos............................   420.91
Sale of stock.................................$1,350.00
Market price of stock........................ 1,000.00

                                      $ 350.00
Equity in house Second Avenue...............   350.00   700.00

                                         $1,525.91

Less:

Balance of note Central Nat'l Bank 1/3 of $1,900........   633.34   892.57

                                         $ 756.14

Check held by your Mr. F. D. Robins made payable to
    S. T. Massey for salary drawn on the Central Na-
    tional Bank, dated Jan. 13, 1934.  Ck. No. 5119...   50.00
Interest @ 6 c for 3 yrs. 2 mos....................... 9.50   59.50

                Actual balance due Jones & Robins, Inc......... $ 696.64"

                Attention is directed to these three items:

                "Interest   on  $1,350.00   check
                    dated  3/21/32  6%  for  5
                    years ....................   $ 405.00
                "Sale of stock.................$1,350.00
                "Market price of stock........ 1,000.00

                           $ 350.00"

Massey could not charge Robins with anything derived from the sale of Massey's stock by Massey to Livers. He undertakes to justify this charge in this way: He said he could have bought these ten shares of stock from others at par, and that he is entitled to anything over par which he obtained from Livers for Robins' stock; that Robins is entitled to no more for his stock than others would have gotten. Robins knew what Livers was to pay, and it should have been turned over to him untolled.

Massey's explanation of why he charged Robins with interest we do not understand. If we accept his account of the transaction, it was an improper charge. And it was improper even if Robins' version be accepted, for Robins was to hold the $1,350, free of interest, and Massey was to receive all of the dividends payable on the 55 shares standing in his name. This interest charge is improper under any theory of the case. Massey turned over to Robins the gross proceeds of sale. The only reasonable explanation for this is that he was selling Robins' stock for Robins, and so the matter stood as a completed transaction for more than five years without complaint from any one.

Massey, except under heavy pressure, would not have been willing to reduce his holdings in a corporation upon which he depended for support; and this is what would happen if Robins' contention is sustained: He would have $1,350 and Massey would have 45 shares of stock left. He did not need the money for he did not keep it. The net result of this transaction, if we adopt Robins' contention, would have been to weaken Massey's hold upon his corporation.

Massey's account of the manner in which this stock was dealt with is a reasonable account and is just what might have been expected of ordinary business men in the ordinary course of business. He sold stock which stood in Robins' name, and he turned over to Robins the gross proceeds of sale, and that is what might have been expected if he was selling Robins' stock. Robins was equally interested with Massey in bringing Livers into their corporation.

We need not elaborate upon the manner in which we

consider a judgment based upon depositions and documents. We take them as the lower court took them, subject only to this qualification: Its judgment is supposed to be right, and the burden of proof is upon him who attacks it.

If Robins were to prevail, he would retain ten shares of Massey's stock which he now holds, and he would have to turn over to Massey $1,350, from which it will be seen that control of the corporation is that for which these men contend. As further evidence of this we find that Robins undertook to purchase six shares of stock from Mrs. Frye, inherited from her husband who died on September 3, 1939. For these six shares he offered $3,000. That offer was refused, and he then undertook to purchase the five shares of Baker stock for $3,000. That offer was refused. If Massey prevails, he and those who have heretofore been friendly towards him will continue in control. If Robins is given ten shares of this block of stock which now stands in Massey's name, then control will pass from Massey to Jones and Robins. As matters now stand, Massey would probably have to look elsewhere for employment.

On February 15, 1932, Massey in writing assigned to Jones his interest in this 55 share block of stock held by the bank and subject to the bank's claim. That assignment was to secure all that was then due to Jones or might become due during that year.

J. R. Weaver, a certified public accountant, has found that there was nothing due to Jones at the end of that year. This accountant also found that there was due to Jones and Robins from Massey as of March 4, 1937, $1,212.12. Jones said this was satisfactory. For this accepted sum judgment went. This, with interest, the court in its decree said was a lien upon Massey's stock held by Robins. No one has challenged this finding in this decree, and so it stands.

Plaintiff charges in his bill that this block of 55 shares of stock was in the possession of Jones and Robins, who are threatening to sell the same, or so much thereof as may be necessary to satisfy their claim against him. He further

prayed that they be restrained from selling until their rights, if any, had been determined.

To that bill Jones, Robins and Jones & Robins, Incorporated, filed their answer, in which they contended that they had a right to hold this stock until they have been paid in full "and until the said complainant has delivered to Franklin D. Robins ten shares of the capital stock of Massey Builders Supply Corporation, which ten shares are justly owned by and should be delivered to the said Franklin D. Robins." Afterwards Robins filed a cross-bill in which he set out in detail his claim to this ten-share block of stock. The prayer of that cross-bill is that Massey "be compelled by this court to transfer to this respondent ten shares of the capital stock of Massey Builders Supply Corporation owned by the said S. T. Massey and included in the fifty-five shares," and for general relief, etc.

One of the purposes of a cross-bill is to bring to the attention of the court new germane matter, but it should not be permitted for an object equally available in an answer. *Tate* v. *Vance*, 27 Gratt. (68 Va.) 571; 10 R. C. L. 483; *Thomas* v. *Thomas*, 250 Ill. 354, 95 N. E. 345, 35 L. R. A. (N. S.) 1158, Ann. Cas. 1912B, 344.

In this case Robins' claim to this stock might not only have been set up in an answer but it actually was set up. Thereafter, without objection, evidence was taken which covers 200 pages of printed matter. Not until after the evidence was concluded was it suggested that the allegations of a cross bill be taken *pro confesso*. This evidence, as we have seen, does not sustain Robins' claim and, having failed in this respect, it is too late for him to fall back upon the principles of a decree *pro confesso* even if he was originally so entitled. *Burch* v. *Grace St. Bldg. Corp.*, 168 Va. 329, 191 S. E. 672.

It is true that the main part of this testimony was taken within ninety days from the filing of the bill. Code, section 6122. But not all of it. Mr. Robins himself was recalled for further direct examination after that period had ex-

pired, and Mr. Jones was recalled for direct examination on June 7, 1940.

Section 6122 was intended to prevent delay in the prosecution of a suit. *Worsham* v. *Nadon*, 156 Va. 438, 157 S. E. 560. Here there was no delay; evidence was completed, and the cause was submitted with more than ordinary promptness.

The decree appealed from should be affirmed, and it is so ordered.

*Affirmed.*