# Richmond

## S. T. MASSEY v. LUTHER C. JONES, ET AL.

January 24, 1944.

Record No. 2726.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Alexander H. Sands* and *Edward A. Marks, Jr.*, for the plaintiff in error.

*Norman L. Flippen* and *Archibald G. Robertson*, for the defendants in error.

CAMPBELL, C. J., delivered the opinion of the court.

This is an action for insulting words, under the Acts of 1940, page 294, (Michie's Code 1942, section 5781), brought by S. T. Massey against Luther C. Jones and Franklin D. Robins, individually and as agents for Jones and Robins, Incorporated. The action is based upon oral and written communications, alleged to be false and defamatory, and, under the said statute, to constitute insulting words within the purview thereof. The offending language is alleged to have been spoken during the trial of a chancery suit instituted by Massey against Robins, Jones and others, then pending before the Law and Equity Court of the City of Richmond, and later heard by this court upon an appeal.

By agreement of the parties litigant, the record in the aforesaid chancery suit, *Robins* v. *Massey*, 179 Va. 178, 18 S. E. (2d) 385, is treated as a part of the notice of motion.

In order to present the allegedly libelous matter in its proper setting, the material averments of the notice are set forth in a footnote to this opinion.*

---

*" 'During the year 1931 Mr. Massey became financially involved with Massey Builders' Supply Corporation, whereby he had overdrawn his account in excess of $10,000.00 during 1931, and the early part of 1932, and Mr. Massey, with 107 shares of stock, Mr. Robins with 70 shares of stock, and myself with 70 shares of stock, held a controlling interest in the Massey Builders' Supply Corporation. When it was discovered that this shortage occurred, which was during the audit for the year 1931, I discussed the matter fully with Mr. Robins and Mr. Massey, and persuaded Mr. Robins to go along with me at a stockholders' meeting to save Mr. Massey harmless of any suit that might be brought that would involve him in any criminal affair.'

"(Meaning and intending to be believed that the plaintiff deliberately, fraudulently, and by theft attempted to wreck his business to his own personal profit, and that as a result thereof, that the plaintiff was facing arrest and criminal prosecution, with the inference that plaintiff had committed a crime.)

"And further:

"' * * * covering a part of the funds which he had withdrawn from the Company without consent or approval of any of the officers or directors.'

"(Meaning and intending it to be believed that the plaintiff fraudulently withdrew from his company, without proper approval, certain funds; that he was a common embezzler and unfit and untrustworthy to deal with the public.)

"And further:

"'A. Mr. Sands, at the time he overdrew his account, due to the family connections and my associations with Mr. Massey, and it being the first time that I knew he had ever been financially involved, I felt it was my sole duty to stand by him, and I did so, and persuaded my associate, Mr. Robins, to do likewise, somewhat under protest. I think the record will indicate in the voting at this meeting that Mr. Robins and myself and Gordon Maynard and Bob Frye were the only people who stood by him. All the other people were bitterly opposed to my shielding him in this affair.

"'Q. You spoke in reference to, in your initial testimony, something about some criminal responsibility of his. What do you have reference to in that connection?

"'A. Well, I do not think he had any right to take the Company's money to the extent of $10,000.00 without the consent of anybody and use it, and I think the other stockholders thought that he was criminally liable.'

"(Meaning and intending it to be believed thereby that the plaintiff maliciously and intentionally committed a crime, whereby it was necessary that Luther C. Jones persuade his associates to shield him from criminal prosecution, that due to the plaintiff's actions he had committed a crime and was liable to criminal proceeding, and that plaintiff was so guilty that

To the notice of motion the defendants demurred, on the ground: "That the said notice of motion shows on its face that all allegations relating to certain depositions and court records are privileged and therefore cannot be the basis for a cause of action."

The trial court was of opinion that the alleged slanderous or insulting words .(which were a part of the testimony in the chancery cause of *Robins* v. *Massey*, *supra*, given in the regular trial thereof) were pertinent and relevant to the matters under inquiry in said chancery cause, and sustained the demurrer on the ground that the language complained of, having been spoken in the course of a judicial proceeding, was privileged.

---

it was with difficulty that he so persuaded Mr. Robins, and that the other people were bitterly opposed to him so shielding him. That he embezzled, and used to his own profit, $10,000.00 of the money of the Corporation, and that the stockholders thereof thought him a criminal.)

"And further:

"' * * * and not until it was conclusively shown to me that Mr. Massey was trying to double-cross me did I have any feeling otherwise.'

"(Meaning and intending it to be believed thereby that the plaintiff is a falsifier and a double-crosser and not a proper person to be entrusted with the affairs of others or a corporation.)

"And further:

"'The minority stockholders thought so, anyway (that plaintiff was a criminal) and they wanted to prosecute him.'

"And further:

"'A. I have no desire to prosecute him now. I am still 100 per cent for him and for the Massey Builders' Supply Corporation, but I think it would disturb you if you were put in the same position, to think that when you had stood by a man in the trouble that he was in, that he would later double-cross you and try to get control of the Company and throw it in a different direction.'

"(Meaning and intending it to be believed that the plaintiff had committed a crime for which he could be prosecuted; that plaintiff was in such trouble that it was necessary that he needed to be shielded and stood by; and again reiterated that plaintiff was such a person as would double-cross and defraud a friend and relative and attempt to maliciously and fraudulently gain control of his Company for ulterior purposes.)

"And further:

"'A. Mr. Sands, Mr. Massey suggested that cut in his salary, but what it was, Mr. Massey realized that he was largely responsible, even though we were in a depression, for the financial condition that the Company was in through those lean years, having depleted its capital by some $10,000.00 without anybody's consent or knowledge. This is a just and honest debt.

This action of the court is assigned as error.

It is beyond dispute that the language upon which the action is based was uttered in the course of a judicial proceeding.

Since this court, in *Lightner* v. *Osborn*, 142 Va. 19, 127 S. E. 314, and *Penick* v. *Ratcliffe*, 149 Va. 618, 140 S. E. 664, has stated the applicable rule in cases similar to the case at bar, it is unnecessary to consider the English rule or the rule prevailing in other jurisdictions. By those cases we are committed to the doctrine that absolute privilege protects an individual against liability for defamatory words spoken in the course of a judicial proceeding, when such words are pertinent and relevant to the subject of inquiry, or in response to the question, irrespective of malice or falsity.

---

It is composed of money that he took from the Company without anybody's consent and of merchandise he took from the Company, and from the standpoint of right and justice there is no reason why he should not pay it.'

"(Meaning and intending it to be believed thereby that the plaintiff had, through theft, weakened the financial condition of his Corporation; that he had maliciously and fraudulently depleted his capital by $10,000.00 without the knowledge or consent of anyone; that he was an embezzler, thief, and a common crook; that plaintiff avoids an honest obligation; that he has no honesty in him and that he does not recognize right and justice in his dealings with other people.)

"And further:

"'* * *. In the early part of 1932, after we had attempted to clarify or satisfy the financial difficulties of Mr. Massey pertaining to Massey Builders' Supply Corporation, Mr. Robins and Mr. Frye and Mr. Massey and myself entered into a certain agreement that we would stand together in the voting of our stocks so long as he properly conducted himself with the Corporation.'

"(Meaning and intending it to be believed thereby that the plaintiff had deliberately caused financial difficulties of the Corporation, that he could not be trusted to conduct himself or his business, that he could not be relied upon without being watched over and supervised; and that he was not worthy of confidence and respect due a gentleman and business man in his position; that he maliciously and wilfully ignores the principles of right and fair dealing, honest management, and fair play; that he misrepresents the facts, and has been and is unreliable.)

"And further:

"'Q. You were present when Mr. L. C. Jones testified with reference to that transaction, were you not?

"'A. I was.

Counsel for plaintiff contends there is a sharp distinction apparent between a case in which the allegedly libelous matter goes to the essence of the case in the pleadings, as in the *Penick case, supra,* and a case in which such allegedly slanderous matter flows from the mouth of a witness under examination, as in the *Lightner case, supra,* and that, therefore, the trial court was in error when it held that the case at bar was ruled by the *Penick case, supra.*

In view of this contention, it becomes necessary to advert to the facts appearing in the two cases.

The Lightner Publishing Company employed Osborn as managing editor of "The Peanut Promoter." The written contract obligated Osborn not to enter thereafter into competition, directly or indirectly, with the corporation within a period of five years. Subsequent to signing the contract,

---

" 'Q. Was his statement correct?
" 'A. It was.
" 'Q. And do you subscribe to it as your own testimony?
" 'A. I do.'

"(Meaning and intending it to be believed thereby that the plaintiff had deliberately, fraudulently, and by theft attempted to defraud the creditors and stockholders of the Massey Builders' Supply Corporation to his own personal benefit and profit; that the plaintiff was facing arrest and criminal prosecution for the reason that plaintiff had committed a crime; that the plaintiff was an embezzler, unfit and untrustworthy to handle the affairs of a corporation and to generally deal with the public; that the plaintiff intentionally committed such a crime as to make it necessary that he be shielded to prevent arrest and being sent to the penitentiary; that the plaintiff had embezzled to his own use $10,000.00 in money of the Massey Builders' Supply Corporation; that the plaintiff was a falsifier, a double-crosser, that he was dishonest and an unfit person to deal with the public and that he could not be relied upon or entrusted with the affairs and funds of others.)

"And further:

" 'In 1932 Mr. Massey was in default to the extent of about $10,000.00 to this corporation of which he was President and General Manager. The minority stockholders were seeking not only the recovery of that indebtedness for the corporation but were also threatening criminal prosecution of Mr. Massey. It was through efforts of Messrs. Jones and Robins that Mr. Massey was enabled to avoid such action (R., p. 128).'

"(Meaning and intending thereby that it should be believed that the plaintiff had committed a criminal offense and was facing arrest and criminal prosecution from which he was saved through the efforts and offices of said defendants.)"

Osborn severed his connection with the corporation and started publication of a similar trade paper called the "Peanut Journal." Thereupon, the Lightner Publishing Corporation filed a bill in the Circuit Court of the city of Suffolk, praying that Osborn be enjoined from publishing the "Peanut Journal," That was the sole issue involved in the suit.

During the progress of the injunction suit, Lightner, testifying as a witness, repeated with emphasis a statement contained in a letter which he had written to one J. R. Fleming. "The letter accused Osborn of shortage in his accounts, of robbing the customers of Lightner Publishing Corporation, and stated that he had the knack of robbing a man and make him like it and that he would 'sting' those who advertised in the 'Peanut Journal.'" (Opinion).

The above language was the basis of Osborn's action at law to recover damages for insulting words, under section 5781 of the Code of 1919. The trial resulted in a verdict for Osborn.

It was the contention of Lightner, in this court, that the statements made in the trial of the injunction suit were absolutely privileged and relieved him of any liability. Judge West, delivering the opinion of the court, disposed of the contention in this language:

"Lightner's statements while testifying in the chancery suit were privileged only in so far as they were pertinent and material to the issue raised therein.

"In Newell on Slander and Libel (2d ed.) 424, paragraph 27, this is said: 'And the same doctrine is generally held in the American courts, with the qualification as to parties, counsel and witnesses, that their statements made in the course of an action must be *pertinent* and *material* to the case. The qualification of the English rule is adopted in order that the protection given to individuals in the interest of an efficient administration of justice may not be abused as a cloak from beneath which to gratify private malice.' (Italics ours).

"The bill in the chancery suit was a pure bill for an injunction, the only issue being whether Osborn had violated his contract not to enter into competition, directly or indirectly, with Lightner Publishing Corporation within a period of five years, and not to accept employment with any competitor or competing publisher. The issue involved did not warrant the statement as to Osborn's 'shortage' or that he, while in the defendant's employ, was 'robbing our customers.' As said by Newell, at page 425: 'The privilege is limited and that limit is: That a party or counsel shall not avail himself of his situation to gratify private malice by uttering slanderous expressions, either against a party, witness or third person, which have no relation to the cause or subject matter of the inquiry.'"

These are the facts in the *Penick case, supra*: Penick and fifteen other qualified voters of Henrico county filed their petition in the circuit court, contesting the election of W. Conway Saunders as a supervisor for the county of Henrico. Ratcliffe was named one of the defendants. It was alleged in the petition that Ratcliffe, who acted as one of the judges of the election, was a school trustee, and, as such, was in a position of influence when contracts for the transportation of school children were to be placed. It was also alleged in the petition that while acting as judge of election, he attempted to bribe a voter by offering to give him a contract for this transportation, if he would vote for Saunders. Thereupon, Ratcliffe brought his action of slander against Penick and the other petitioners, to recover damages for the alleged libelous language in the petition. There was a trial by jury which resulted in a verdict for Ratcliffe. In this court it was contended by Penick that the language complained of was pertinent and relevant to the relief sought under the prayer of the petition, and, therefore, he was not liable in damages. In sustaining the contention of Penick, Mr. Justice Holt said:

"In a note to 16 A. L. R. 743, is this statement of the rule:

" 'As to the degree of relevancy or pertinency necessary to bring the alleged defamatory matter within the privilege, the courts favor a liberal rule. Thus, the matter to which the privilege does not extend must be so palpably wanting in relation to the subject matter of the controversy that no reasonable man can doubt its irrelevancy and impropriety.'

"In the light of the foregoing statements of the law, were the offending charges material, relevant or pertinent to the relief that might have been legitimately sought under the petition into which they were incorporated? We think they were. They were pertinent as a primary proposition and our judgment here is fortified by the fact that they must be so construed whenever the matter is in doubt. Public policy demands that within all reasonable limits a litigant should have the right to state his case as he sees fit."

See also 33 American Jurisprudence, sec. 150, p. 146.

In *Guide Pub. Co.* v. *Futrell*, 175 Va. 77, 7 S. E. (2d) 133, Mr. Justice Hudgins quoted from *Rosenberg* v. *Mason*, 157 Va. 215, 160 S. E. 190, this language:

"In Virginia both the truth and privilege are complete defenses in bar of any action for defamation, whether it be for common law slander or libel, or for insulting words, and the same rules of law with reference to the *pleadings* and *proof* of these defenses apply in an action under section 5781 as in an action for common slander or libel." (Italics supplied).

It is, in our opinion, impossible to draw a distinction between the doctrine stated in the *Lightner case* and that stated in the *Penick case*. Whether the action for the recovery of damages be brought upon the charge of slander or upon the charge of libel, the test to be applied upon a plea of privilege is the relevancy and pertinency of the alleged offending language to the matter in inquiry. This being our view of the applicable rule of law, the question for determination is, was the language here complained of pertinent and relevant to the matter under inquiry in the chancery suit of *Robins* v. *Massey*, Record No. 2468, supra?

We are unable to agree with counsel for plaintiff that the suit of *Robins* v. *Massey* was "a chancery suit for an injunction." In this view we are fortified by the statement found in the petition for a writ of error. There we read:

"The pleadings consist of bill of complaint, alleging the cause of action and with prayer for injunction to preclude sale of said stock, and for an accounting of the debt secured thereby, joint and several answer of the defendants, denying in large part the allegations of the bill of complaint, cross-bill of Jones & Robins, Inc., seeking settlement of its account with Massey, and cross-bill of Robins seeking an adjudication that ten of the fifty-five shares of stock belonged to him by virtue of facts and agreements alleged therein."

The prayer of the bill of complaint of *Robins* v. *Massey*, etc., (Record 2468) is, in brief, that Jones, Robins and Jones & Robins, Incorporated, be enjoined and restrained from advertising or selling the fifty-five shares of stock claimed by Massey; that they be required to render an account as to the indebtedness claimed to be due them by Massey; that a proper accounting be had between the parties; and that the rights of the parties under said accounting be determined and, through such accounting, a proper judgment entered.

Another evidence of the scope of the inquiry in the chancery suit is the record (2468) containing two hundred and forty-eight pages dealing with the many controverted issues presented by the pleadings.

To attempt a *seriatim* discussion of the many questions involved would serve no good purpose. The *crux* of the present case is shown by the following facts: During the examination in chief of Massey, it was brought out that in the year 1931 he had, without the knowledge or consent of any of the officers or directors of the Massey Builders' Supply Corporation, withdrawn for his personal use approximately ten thousand dollars of the corporate assets; that these withdrawals were discovered in February, 1932; that, on February 15, 1932, Massey wrote a letter to Jones in which he stated:

"February 15, 1932.

"Mr. L. C. Jones,
"c/o Jones & Robins,
"Richmond, Virginia

"My Dear Sir:

"Referring further to our interview relative to my excess withdrawals from Massey Builders' Supply Corporation, I beg to confirm my statement to you that I intend to offer to the Board of Directors of the Company on account of these withdrawals, all of the unencumbered assets that I now have, or sufficient amount thereof to fully settle the account.

"In doing this, I do not mean or intend in any way to weaken any security to you for any indebtedness that I may have to you, but do confirm my previous oral assignment to you of any equity that I may have in the fifty-five (55) shares of capital stock of the Massey Builders' Supply Corporation, now hypothecated with Central National Bank as collateral on what I owe, and this amount secured by the stock being now approximately Thirty-two Hundred Dollars ($3,200.00), and in order that there will be no misunderstanding about this matter, I hereby in consideration of the sum of Ten Dollars ($10.00) cash in hand paid to me by you, receipt of which is hereby acknowledged, and other valuable consideration, do transfer, sell and assign to you all right, title and interest owned by me in said fifty-five shares of capital stock of Massey Builders' Supply Corporation over and above the claim of the said Central National Bank against said stock on account of the said debt of mine to the Bank for approximately Thirty-two Hundred Dollars, and any other obligations that I may owe to the said Bank, this assignment to be held by you as collateral for any and all obligations at this time owed by me to you and for any additional advances that you may make to me during the calendar year 1932.

"Witness my hand and seal this 15th day of February, 1932.

"S. T. Massey. (Seal)."

It is shown, also, that pursuant to this letter he assigned 55 shares of the stock of the corporation to secure certain indebtedness; that a meeting of the stockholders was held to consider these unauthorized withdrawals and at this meeting, mainly through the efforts of Jones, a brother-in-law of Massey, there was an adjustment of this matter over the protest of a minority of the stockholders who threatened criminal proceedings.

In this bill of complaint Massey denied any indebtedness to Jones and Robins and directly sought to control the future management of the corporation. In an effort to show how the indebtedness to Jones and Robins, alleged in the cross-bill, came about, Jones was introduced as a witness. It was during his examination that the offending language was uttered.

As we comprehend the testimony of Jones, it was clearly pertinent and relevant to show, if possible, the indebtedness claimed, and also to show the alleged unfitness of Massey to manage the corporation in the future.

The first assignment of error is without merit.

As the second assignment was not discussed in the petition for a writ of error, it will not be discussed in this opinion.

The judgment will be affirmed.

*Affirmed.*