# Donohoe Construction Co., Inc.

## v.

# Mount Vernon Associates

Record No. 850154

June 10, 1988

Present: Carrico, C.J., Poff, Compton, Stephenson, Thomas, and Whiting, JJ., and Cochran, Retired Justice

*Gary W. Brown (Bromley, Brown & Walsh*, on briefs), for appellant.

*John P. Rowley, III (Marc E. Bettius; Bettius, Connor, Duff & Sanderson*, on brief), for appellee.

STEPHENSON, J., delivered the opinion of the Court.

The dispositive issues in this appeal are whether (1) the filing of a memorandum of mechanic's lien is a "judicial proceeding" entitling the claimant to the defense of absolute privilege in a suit for slander of title, and (2) the evidence is sufficient to support a jury's finding of abuse of process.

Mount Vernon Associates (Mount Vernon) sued Donohoe Construction Co., Inc. (Donohoe), alleging slander of title and abuse of process arising from Donohoe's filing of an invalid mechanic's lien against Mount Vernon's property. A jury returned a verdict for Mount Vernon, assessing compensatory damages of $190,000 and punitive damages of $600,000. The trial court entered judgment on the verdict, and this appeal ensued.

I

Because Mount Vernon prevailed at trial, we must state the evidence in the light most favorable to it. Mount Vernon is a limited partnership formed for the purpose of operating a nursing home. Its general partner is Samuel L. Hinson, Jr. In the mid-1970's, Mount Vernon became interested in developing a nursing home facility in Fairfax County. Mount Vernon obtained a commitment for a construction loan from the United States Department of Housing and Urban Development (HUD). The HUD loan com-

mitment provided a reduced financing rate and an enhanced loan term.

After Mount Vernon's architect had completed the plans and specifications for the facility, Mount Vernon requested bids on the project from four construction companies. Donohoe was the low bidder, and Mount Vernon accepted Donohoe's bid.

Thereafter, Donohoe's representatives met with Hinson and Mount Vernon's architect to review the plans and specifications. Upon learning that HUD required a liquidated damages clause in the contract, Donohoe requested and Mount Vernon agreed to an additional 100 days for completion of the project. On July 28, 1977, Mount Vernon and Donohoe executed a contract for construction of the facility at a cost of $1,867,776. The contract provided for a completion date of July 16, 1978. It also provided that HUD had the ultimate authority to decide all questions involving construction and payment.

Following execution of the contract, construction progressed slowly. In fact, by December 1977, no "substantial improvements" had been made at the site. At that time, a dispute arose between Mount Vernon and Donohoe over who should pay certain charges, including a water availability fee charged by Fairfax County. When Hinson suggested to Donohoe's president, James Donohoe, that they look to the contract for the answer, James Donohoe stated that he did not care what the contract provided and unless the issue was resolved in Donohoe's favor, Donohoe "would have or . . . might have difficulty delivering the [nursing home]."

Because construction was well behind schedule, Donohoe was advised in June 1978 that if the project was not completed by July 16, 1978, HUD would assess liquidated damages in the amount of $997.64 per day in accordance with the terms of the contract. On July 6, 1978, Donohoe advised Mount Vernon that it would strive to have the main floor of the building substantially completed by August 15, 1978, and to have the ground floor substantially completed 1-½ weeks thereafter. Donohoe stated, however, that it could meet that schedule only if Mount Vernon and Donohoe resolved two issues that were the subject of arbitration between the parties: (1) the water availability fee, and (2) Donohoe's request for a time extension to complete the project.

On August 8, 1978, Hinson asked Frank Donohoe, Donohoe's executive vice-president, "why don't you get a crew out here and finish this building?" Frank Donohoe responded, "I've got 17

projects going. This is the least profitable. Unless you concede on these items in controversy, . . . I cannot motivate my people to get out here and finish your building without your concessions on these items."

The items in controversy were (1) reduction of retention (the amount retained from requisitions to insure completion of construction) from 10% to 5%, (2) an extension of time for completing the project, and (3) payment of the water availability fee. Hinson told Donohoe that HUD had approval authority over the first two items and that the architect had already ruled on the third item.

Donohoe failed to complete construction by August 1978. Consequently, Mount Vernon was forced to cancel commitments to patients and staff.

In mid-November 1978, Donohoe asked Hinson to move his temporary office into the unfinished building so that Mount Vernon's trailer, which was being used as an office, could be removed from the construction site. Hinson honored the request. In late December 1978, however, Donohoe's project manager informed Hinson that he was occupying the building illegally, and unless Hinson agreed to reduce the retainage from 10% to 5%, he would be evicted. Hinson again informed Donohoe that HUD, not Mount Vernon, had the authority to approve reductions in retainage. Although Hinson was agreeable to the reduction, HUD would not approve it. In January 1979, HUD advised Donohoe that liquidated damages would be assessed for its delay in completing the project.

The project was substantially completed on March 12, 1979. On that date, Mount Vernon received a HUD permit to occupy the building.

On March 16, 1979, Donohoe filed a memorandum of mechanic's lien in the clerk's office of the court below, claiming an indebtedness of $389,576.11. The statements set forth in the memorandum were sworn to before a notary public by one of Donohoe's officers. Donohoe's lien claim was based in part upon 452 days of claimed delay on the job and extra costs associated therewith. On April 26, 1979, Donohoe filed a bill of complaint to enforce the lien.

Three days after Donohoe filed the lien, it submitted a requisition, claiming only $190,148 was owing. Three months later, Don-

ohoe submitted a revised requisition, claiming it was due only $100,899.

At the time the lien was filed, Mount Vernon had paid all bills presented and was aware of no outstanding requisitions from Donohoe. Although several change orders had not been paid when the lien was filed, Mount Vernon never questioned that they were owing and had deposited funds with its lender for processing according to HUD procedure.

In the suit to enforce, the court concluded that the lien was invalid. The court determined that Donohoe had filed the lien prematurely. The court also found that the lien included claims not compensable under the contract, as well as claims not yet owing. After crediting Donohoe for work performed, the court awarded Mount Vernon judgment on its cross bill for $19,723.20, the balance due Mount Vernon for delay and corrective work.

By a two-count motion for judgment, Mount Vernon subsequently instituted the present action, alleging that Donohoe's filing of the invalid mechanic's lien (1) slandered Mount Vernon's title, and (2) constituted an abuse of process. At trial, Mount Vernon relied upon the chancery court's prior determination that "Donohoe knew or should have known that it was filing its lien improperly." Consequently, the trial court limited the presentation of evidence to matters relevant to determining Donohoe's intention when it filed the lien.*

Mount Vernon introduced several letters and memoranda written by Donohoe after it knew HUD definitely would assess liquidated damages for delay, but before Donohoe filed its mechanic's lien. These documents showed that Donohoe had considered filing a lien to prevent closing on permanent financing and to "force [Mount Vernon] into a final settlement and avoid arbitration and litigation if at all possible."

The only evidence relating to Donohoe's actions after it filed the lien was an internal memorandum prepared by Donohoe's director of field operations. The memorandum, dated six days after the lien had been filed, instructed Donohoe's project manager for the Mount Vernon nursing home to contact Mount Vernon's architect to check on the date he had received a change order. If the architect had not acted on the change order within ten days, the period provided by the contract, the project manager was to:

---

* This ruling is not an issue in this appeal.

call [the architect] and get him down to the Nursing Home for some ambiguous reason or else tie him up in the office looking up information . . . .

Immediately upon the lapse of this time, send out the letter citing past references of delays and that this is a typical occurence [sic] in the course of this job. This is one of the major faults of this job.

Also, call [Donohoe's attorneys] and tell them to release the lien, or file it.

The evidence does not indicate that Donohoe's project manager ever acted on this memorandum or that Donohoe took any other action after it filed its mechanic's lien.

## II

We first consider Donohoe's contention that the filing of the memorandum of mechanic's lien constituted a judicial proceeding and, therefore, entitled Donohoe to the defense of absolute privilege in the slander of title suit. It is well settled that "words spoken or written in a judicial proceeding that are relevant and pertinent to the matter under inquiry are absolutely privileged." *Darnell v. Davis*, 190 Va. 701, 707, 58 S.E.2d 68, 70 (1950).

The reason for the rule of absolute privilege in judicial proceedings is to encourage unrestricted speech in litigation. *Watt v. McKelvie*, 219 Va. 645, 649, 651, 248 S.E.2d 826, 828, 829 (1978). "[T]he public interest is best served when individuals who participate in law suits are allowed to conduct the proceeding with freedom to speak fully on the issues relating to the controversy." *Id.* at 651, 248 S.E.2d at 829.

Although courts may differ in determining when a proceeding is "judicial," the rule of absolute privilege accorded judicial proceedings is not limited to trials. *Penick v. Ratcliffe*, 149 Va. 618, 627-28, 140 S.E. 664, 667 (1927). Indeed, "[t]he rule is broad and comprehensive, including within its scope all proceedings of a judicial nature," *id.* at 628, 140 S.E. at 667, and includes "any proceeding for the purpose of obtaining such remedy as the law allows," *id.* (petition in election contest); *see also Darnell*, 190 Va. at 708, 58 S.E.2d at 71 (petition to dismiss criminal warrant); *Massey v. Jones*, 182 Va. 200, 201, 204, 28 S.E.2d

623, 623-24, 626 (1944) (trial testimony); *James* v. *Powell*, 154 Va. 96, 111, 152 S.E. 539, 544-45 (1930) (indictment).

In enacting the mechanic's lien statute, the General Assembly enunciated a policy consideration that those furnishing labor and materials in construction should be paid or have recourse by lodging a lien against the property benefitted by their labor or material. *Gilman* v. *Ryan*, 95 Va. 494, 498, 28 S.E. 875, 876 (1898). In order to perfect a mechanic's lien, a claimant, within a prescribed time period, must file in the proper clerk's office "a memorandum showing the names of the owner of the property sought to be charged, and of the claimant of the lien, the amount and consideration of his claim, and the time or times when the same is or will be due and payable, verified by the oath of the claimant . . . ." Code § 43-4.

The claimant must appear and make oath before a notary public (or some other official authorized to administer an oath) that the owner is justly indebted to the claimant in the amount and for the consideration stated in the memorandum. Code § 43-5. Significantly, the taking and certifying of an acknowledgment by a notary public is a judicial act. *Yates* v. *Ley*, 121 Va. 265, 270, 92 S.E. 837, 839 (1917); *see Harlow* v. *Clatterbuck*, 230 Va. 490, 493, 339 S.E.2d 181, 184 (1986).

The clerk is required to record and index the sworn memorandum, and "[t]he cost of recording such memorandum shall be taxed against the person found liable *in any judgment or decree enforcing such lien*." Code § 43-4 (emphasis added). "The liens created and perfected under [the mechanic's lien statute] may be enforced in a court of equity . . . ," Code § 43-22, and "[n]o suit to enforce . . . shall be brought after six months from the time when the memorandum of lien was recorded or after sixty days from the time the [improvement] was completed or the work thereon otherwise terminated, whichever time shall last occur . . . ," Code § 43-17.

Thus, a duly perfected mechanic's lien will be extinguished unless the suit to enforce is timely filed. Code § 43-17. Similarly, the suit to enforce will be dismissed unless there has been a timely perfection of the lien. *Id.* Accordingly, both perfection and enforcement must meet the statutory requisites before a claimant can recover under the mechanic's lien statute.

Applying the broad rule enunciated in *Penick*, 149 Va. at 627-28, 140 S.E. at 667, we conclude that the filing of the memo-

randum of mechanic's lien constitutes a judicial proceeding. *Accord Frank Pisano & Assoc.* v. *Taggart*, 29 Cal. App. 3d 1, 25, 105 Cal. Rptr. 414, 430 (1972). As previously noted, it is a prerequisite to a suit to enforce. For a claimant to obtain the remedy provided by statute, he must *perfect* his lien and, thereafter, sue to *enforce* it. The two proceedings are inseparable.

■ The inquiry does not end with our finding that the perfection of a lien constitutes a judicial proceeding. To be entitled to an absolute privilege, the words employed must be relevant and pertinent to the case. *Lightner* v. *Osborn*, 142 Va. 19, 24, 127 S.E. 314, 316 (1925). We have adopted a liberal rule in determining the degree of relevancy or pertinency necessary to bring a matter within the privilege. *Massey*, 182 Va. at 208, 28 S.E.2d at 627. "Thus, the matter to which the privilege does not extend must be so palpably wanting in relation to [the matter in controversy] that no reasonable man can doubt its irrelevancy and impropriety." *Id.* This is so because "[p]ublic policy demands that within all reasonable limits a litigant should have the right to state his case as he sees fit." *Id.*

■ Applying these principles to the present case, we find that the statements contained in the memorandum were relevant and pertinent. Indeed, these statements were mandated by statute.

■ We conclude, therefore, that Mount Vernon cannot recover on its slander of title claim. Because the statements in the memorandum were absolutely privileged, the trial court erred in refusing to strike Mount Vernon's evidence as it related to the slander of title count.

### III

■ We next consider Donohoe's contention that Mount Vernon's evidence is insufficient to support the jury's finding of malicious abuse of legal process. To sustain a cause of action for abuse of process, a plaintiff must plead and prove: (1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings. *Mullins* v. *Sanders*, 189 Va. 624, 633, 54 S.E.2d 116, 121 (1949); *Glidewell* v. *Murray-Lacy*, 124 Va. 563, 570, 98 S.E. 665, 668 (1919).

■ The distinctive nature of malicious abuse of process lies in the perversion of regularly-issued process to accomplish some ulterior purpose for which the procedure was not intended. *Glidewell*,

124 Va. at 569, 98 S.E. at 667. A legitimate use of process to its authorized conclusion, even when carried out with bad intention, is not a malicious abuse of that process. *Id.* at 570, 98 S.E. at 668. Process is maliciously abused when it is used oppressively, *e.g.*, as "a whip to force the payment of an alleged indebtedness," *Mullins*, 189 Va. at 635, 54 S.E.2d at 122 (citation omitted), or as a means of extortion, *see Glidewell*, 124 Va. at 575, 98 S.E. at 669. The gravamen of the tort lies in the abuse or the perversion of the process after it has been issued. Consequently, "it is not necessary to allege or prove that the process was maliciously [issued]." *Id.* at 571, 98 S.E. at 668.

A kindred, but distinctly different, cause of action lies for malicious prosecution. An action for malicious prosecution most often is based upon an underlying criminal proceeding maliciously instigated without probable cause, which terminated in a manner not unfavorable to the plaintiff. *Pallas* v. *Zaharopoulos*, 219 Va. 751, 754, 250 S.E.2d 357, 359 (1979); *Bain* v. *Phillips*, 217 Va. 387, 393, 228 S.E.2d 576, 581 (1976).

We also have recognized that a cause of action for malicious prosecution will lie for the malicious institution of a groundless civil proceeding. *Ailstock* v. *Moore Lime Co.*, 104 Va. 565, 570-71, 52 S.E. 213, 215 (1905). Because we have adopted the strict English position, a plaintiff in a malicious prosecution action based upon civil proceedings must plead and prove arrest of his person, seizure of his property, or special injury. *Ayyildiz* v. *Kidd*, 220 Va. 1080, 1084, 266 S.E.2d 108, 111 (1980). Malicious prosecution differs from abuse of process in that malicious prosecution lies for "maliciously causing process to issue," *Glidewell*, 124 Va. at 570, 98 S.E. at 667-68, while abuse of process "lies for the improper use of process after it has been issued," *id.*

The present case, which was tried on an abuse of process theory, is similar to *Glidewell*. There, a criminal misdemeanor warrant had been properly issued. The evidence showed, however, that the defendants' ulterior purpose in their use of the criminal warrant had been to collect a private debt. Thus, we held that the first essential element of abuse of process had been established.

The evidence in *Glidewell* also showed that the parties at whose insistence the warrant had issued agreed to dismiss the warrant and release the debtor if he executed a new note evidencing the indebtedness. We said, however, that this settlement was within the spirit of the general legislative policy evinced by the satisfac-

tion and discharge statutes then in effect (present Code §§ 19.2-151 and -152). Those statutes authorized private adjustments between parties immediately concerned in misdemeanors for which a civil remedy also existed. Thus, we held that the evidence did not establish the second element essential to abuse of process, *i.e.*, "an act in the use of the process not proper in the regular prosecution of the proceeding." *Id.* at 572, 98 S.E. at 668.

Similarly, in the present case, the evidence amply supports the jury's finding that Donohoe filed its mechanic's lien with the ulterior purpose of avoiding imposition of liquidated damages for delay or of forcing a settlement without arbitration or litigation. The evidence fails to establish, however, that after filing the lien, Donohoe committed any "act in the use of the process not proper in the regular prosecution of the proceeding."

Although the record may have supported a claim of malicious prosecution, had Mount Vernon established the necessary special injury, *see Ayyildiz*, 220 Va. at 1084, 266 S.E.2d at 111-12, we do not have such a case before us in this appeal. We conclude, therefore, that the evidence does not support the jury's verdict that Donohoe abused the mechanic's lien process.

## IV

In sum, we hold that the filing of a mechanic's lien is a judicial proceeding entitling Donohoe to an absolute privilege against Mount Vernon's slander of title claim. We further hold that Mount Vernon failed to establish the requisite elements of abuse of process. Having reached these conclusions, it is unnecessary to discuss Donohoe's other assignments of error.

Accordingly, we will reverse the trial court's judgment and enter final judgment for Donohoe.

*Reversed and final judgment.*