# Richmond.

## W. H. ELMORE v. MARYLAND AND VIRGINIA MILK PRODUCERS ASSOCIATION, INC.

### March 18, 1926.

1. ISSUES OUT OF CHANCERY—*Issues under Section 6121 of the Code of 1919 and Section 6246 Distinguished—Discretion of Court—Effect of Verdict.*—An issue for trial by jury under section 6121 of the Code of 1919, which provides that "a plaintiff in equity may take issue upon a plea, and either party may have such issue tried by a jury," is entirely different from an issue out of chancery, under section 6246 of the Code of 1919. The granting of an issue under section 6246 of the Code of 1919, rests in the sound discretion of the court and its object is to inform the conscience of the chancellor, and he may disregard the verdict or discharge the jury before verdict. The object of section 6121 is to determine the issue of fact raised by the plea, and the chancellor has no discretion about awarding the jury trial, and the verdict when rendered stands like any other verdict of a jury where the right to jury trial is given, without discretion on the part of the court, and the verdict cannot be disregarded. Either party may have such an issue tried by a jury.

2. ISSUES OUT OF CHANCERY—*Section 6121 of the Code of 1919—Discretion of Court—Case at Bar.*—In the instant case, a proceeding under a marketing contract to enjoin a dairyman from breaking the contract, defendant filed a plea alleging that the contract was never delivered by him to respondent. The sufficiency of the plea was set for hearing by decree and the chancellor overruled it as insufficient, refused to permit a trial of the issue by a jury and the cause was heard on bill, answers and replication, and decided against respondent. If the plea was sufficient, that is, if it stated matter of fact sufficient, if true, to end the controversy in favor of respondent, then respondent was entitled as a matter of right, to have the issue tried by a jury, unless the plea was, as is contended by complainant, (a) overruled by the answer, (b) waived by the amended answer, which put in issue the same matter as that set up by the plea.

3. EQUITY—*Pleading—Pleas—Answer Bringing in Issue the Same Matter as the Plea.*—A defendant in equity by filing an answer which brought

in issue the same matter as was made an issue by his plea, did not thereby overrule the plea.

4. EQUITY—*Pleading—Answer, Plea and Demurrer.*—While in England, a defendant could not demur and plead or demur and answer to the same matter, this rule is inapplicable in Virginia so far as it applied to an answer overruling a demurrer as section 6107 of the Code of 1919 is extended by analogy to proceedings in courts of equity.

5. EQUITY—*Pleading—Demurring, Pleading and Answering.*—Whatever the rule is elsewhere, the procedure, in Virginia, is that a defendant may demur, plead and answer at the same time to the same matter in the bill.

6. EQUITY—*Pleading—Plea Overruled on Demurrer—Answer as Waiver of Plea—Case at Bar.*—The general rule is that where a plea is overruled on demurrer and the defenses raised by the plea are covered by an answer, or an amended answer is filed covering the defenses raised by the plea, this would constitute a waiver of the plea. Therefore, in the instant case, the respondent having filed an amended answer, · embodying the same defenses raised by the plea, after the court had overruled the plea, waived his plea.

7. ISSUE OUT OF CHANCERY—*Section 6246 of the Code of 1919—Discretion of Chancellor—When Issue Should Be Granted.*—The granting of an issue out of chancery, under section 6246 of the Code of 1919, upon the bill, answer, replication and depositions lies not within the arbitrary, but within the sound judicial, discretion of the chancellor, the object of an issue under this section is to inform the conscience of the chancellor, and the mere fact that there is a conflict of evidence does not make it mandatory that such an issue be granted. Where the merits of the case are clear, there is no occasion for an issue.

8. ISSUE OUT OF CHANCERY—*Section 6246 of the Code of 1919—Discretion of Chancellor—When Issue Should Be Granted.*—As a general rule a court of equity has the power of determining all questions of fact without resorting to an issue of chancery, and it should not be employed except where the conflict of witnesses or the obscurity of evidence is such as to make it doubtful on which side the preponderance of evidence lies.

9. MARKETING CONTRACTS—*Suit to Enjoin Dairyman from Breaking His Contract—Evidence Sufficient to Support Injunction.*—The instant case was a suit by a co-operative marketing association to enjoin a member from breaching his contract. The member's defense was that though he had signed the contract he had not delivered it. Admitting the signing of the contract and its possession by the association, the burden of proving that it was not delivered was upon respondent. Though there was a direct conflict between the evidence for complainant and the evidence for defendant, when all the evidence was weighed in the scale of reasonableness and common sense, and in

the light of the surrounding circumstances the preponderance was
with the complainant.

*Held:* That the decree granting an injunction should be affirmed.

Appeal from a decree of the Circuit Court of Fairfax county. Decree for complainant. Defendant appeals.

*Affirmed.*

The opinion states the case.

*Jno. W. Rust* and *Edwin E. Garrett,* for the appellant.

*John S. Barbour,* for the appellee.

CHICHESTER, J., delivered the opinion of the court.

The Maryland and Virginia Milk Producers Association, Inc. (hereafter referred to as complainant), is a corporation organized and existing under the law of the State of Maryland, known as the "co-operative association law" of that State, a law similar in all essential respects to the act of the General Assembly of Virginia, approved February 18, 1922, known as the "co-operative marketing act," and which provides for the incorporation of marketing associations or exchanges and the licensing to do business in Virginia of similar corporations created in other States under similar laws. Complainant has been licensed to do business in Virginia under that act, and has complied with all the provisions thereof.

On July 19, 1924, complainant filed its bill in chancery against W. H. Elmore (hereafter referred to as respondent), and Henry M. Brawner, Jr., trading as Chestnut Farms Dairy, in which it is alleged, in addition to the foregoing facts, that complainant is without capital stock; that it is composed of from 900 to 1000

dairy farmers in Maryland and Virginia; that it is engaged in the production and co-operative marketing of milk and other dairy products; that it is operated for the mutual benefit of its members under its constitution and by-laws, and under uniform contracts signed by each of its members constituting complainant the sole sales agent of its members for the purpose of marketing all of the dairy products of each upon a co-operative basis for a period of three years from October 1, 1923, and thereafter until the contract is terminated by certain notices thereby required.

That the respondent resides on a farm near Herndon, Va., is engaged in farming, and is the owner of a herd of twenty-two cows; that he became a member of the association by signing and delivering the uniform contract to the association on March 25, 1922. A copy of the contract is filed as an exhibit with the bill.

From this contract it appears that respondent employed and appointed the complainant as his sole sales agent during the life of the contract and granted it full power of selling all the milk and cream in the fluid state, produced by him from his cows, and by one of the provisions of the contract covenanted and agreed that if the respondent should at any time refuse or neglect to deliver his milk or cream to the association, or upon its order at such time and place as the association might direct, that in that event he would pay the association, by way of liquidated damages for such refusal or default, the sum of five dollars per cow for each of his cows for the first month, or any part thereof, and that if such default or refusal should continue for more than one month, an additional sum at the rate of ten cents (10¢) per cow for the same number of cows for each day after the first month, so long as such default or refusal should continue; and the contract

further provided that such payments should not be construed to be a penalty or forfeiture, but should be considered as stipulated and liquidated damages, and that in addition to the right to demand and receive such stipulated damages for such defaults, the association should have the right to sue for and enforce the specific performance of the contract, and that the demand should in no way destroy or limit the right of the association to ask for and enforce such specific performance; and respondent further covenanted that such milk, cream or dairy products should be delivered by him to such shipping stations or other plants as the association might from time to time direct. The contract further provided that it should become operative when the board of directors of the association should determine that a sufficient supply of milk had been secured to justify the operations thereunder, and when notice of that fact should have been mailed to respondent, Elmore, at his post office address, specified thereon; and the plaintiff further alleges that its board of directors did determine that a sufficient supply of milk had been secured to justify operations thereunder, and on the 21st day of August, 1923, directed notice of that . fact, and that operations thereunder would be commenced and that the contract would become operative on and after the first day of October, 1923, and this letter was mailed to the respondent, Elmore, at his post office address specified on. the contract on or about the 25th day of August, 1923.

It is then alleged that, pursuant to the 16th clause of the contract, respondent agreed to execute an order directing anyone to whom his milk was delivered to pay the proceeds thereof to the association; that respondent did execute such an order on Henry M. Brawner, Jr., trading as Chestnut Farms Dairy. After-

wards in order to facilitate business, complainant agreed to allow Chestnut Farms Dairy to pay the purchase price of respondent's milk directly to respondent, upon condition that he would give complainant an order on the Chestnut Farms Dairy for brokerage and other expenses to be deducted from the gross proceeds of the milk delivered by him to Chestnut Farms Dairy, as complainant from time to time should ascertain to be properly deductable from all its members under the provisions of the contract; that the respondent failed to avail himself of the privilege or to sign the order, and both he and Chestnut Farms Dairy, pursuant to a purpose to repudiate the contract, each refused and failed to pay complainant for the milk received by Chestnut Farms Dairy from respondent or for the brokerage.

That complainant, on June 16, 1924, directed respondent to cease making further shipments of milk to Chestnut Farms Dairy and to ship all of his milk direct to complainant's plant in Washington, D. C.; that respondent ignored the direction and continued to ship all of his milk to Chestnut Farms Dairy and to collect all the purchase price therefor.

An injunction was prayed for to enjoin and restrain respondent from selling or delivering or shipping any milk produced on his farm otherwise than to the complainant or to some consignee designated by complainant, and that he, respondent, be enjoined from failing to ship when so requested, pending the hearing and final determination of this cause; and that Chestnut Farms Dairy be enjoined from receiving the respondent's milk except with the assent of the complainant and pursuant to its orders.

Respondent filed his answer, by which, while he admitted that he had signed the contract exhibited with

the bill, he alleged that his signature thereto was secured by Dallas Berry, at that time president of the association, and Robert L. Harrison, a director thereof, after he had repeatedly refused to sign it, upon representation by them that if he, respondent, would sign the contract they would at once place it in the National Bank of Herndon, at Herndon, Va., and that it should remain there until he, respondent, would give his consent to have it withdrawn and become effective. Respondent further alleged that they assured him that no one would have the right to take the paper from the bank without his authority. After respondent signed the contract he delivered it to Berry and Harrison, as he alleges, to be placed in the bank as aforesaid.

Respondent denies that he has ever given his consent to the withdrawal of the contract from the bank, or to its delivery to complainant. He alleges that he was surprised when he heard that the paper had been withdrawn from the bank and delivered to the association and that when he heard that this had been done he tried to get the paper in his possession but failed to do so, finally writing the association demanding its return. He denies that he is bound by the contract and prays that he may be dismissed with his costs.

On the same day respondent filed his answer he filed the following plea:

"Now comes the defendant, W. H. Elmore, and says that the said alleged pooling agreement, which is the basis of this proceeding in favor of the complainant against this defendant, filed with complainant's bill, bearing date March 25, 1922, and described in said bill as Exhibit 'A,' was signed by defendant, but was never intended to be delivered to the complainant, and was never legally delivered to said complainant, and therefore this defendant says that said alleged pooling

agreement is not his deed and is not his contract. And of this the said defendant puts himself upon the country.

W. H. ELMORE."

This plea was duly sworn to

On the 15th day of September, 1924, the court entered the following decree in this cause and in four similar causes pending in the circuit court:

"These causes came on this day to be severally heard; and it appearing to the court that the process awarded in each case has been returned duly executed upon each of the resident defendants in person; and that Henry M. Brawner, Jr., trading as Chestnut Farms Dairy, the nonresident defendant in each case, has been served personally with said processes out of this State in strict conformity with the provisions of section 6071 of the Code of Virginia; and that more than ten days have elapsed since such service, which under the statute is equivalent to service by publication; and the defendant, W. H. Elmore, having filed a special plea in that cause, as well as an answer, to both of which the plaintiff has replied generally, and it appearing to the court that each of the other defendants in each of the other cases has filed special pleas, to which the plaintiff has replied generally, and as to which issues have been joined in each case, but that no evidence has been taken in either, it is therefore considered, ordered and decreed by the court that each of the injunctions heretofore awarded in these causes severally be, and the same are, hereby enlarged and continued in full force and effect until the further order of the court."

On September 17, the following decree was entered:

"It appearing to the court that the general replica-

tions of the plaintiff to the several pleas entered by the several defendants in these causes, as noted in the decree herein of September fifteenth, 1924, were entered under a misapprehension of counsel and through inadvertence; and that plaintiff desires to test the sufficiency of said plea before taking issue thereon, on motion of the plaintiff it has leave to withdraw its said replications, and upon its motion the said pleas are set down to be argued."

Argument upon the sufficiency of the plea which was supported by affidavits of respondent, L. C. Ferguson, Ben Middleton, Edgar Kirkpatrick and B. W. Middleton, was had, and the court held that the plea was insufficient, refused to dissolve the injunction or award an issue on the plea. Thereupon respondent filed his amended answer, and we think after a careful scrutiny of the pleadings, that the real and only issue, raised by the plea, the answer and the amended answer, was whether the contract was ever legally delivered to the complainant.

It was stipulated between counsel that only one of the cases above referred to should be tried, and after voluminous depositions had been taken by both complainant and respondent, the court, after overruling a motion of respondent for an issue out of chancery, decided the cause upon the bill, answers and replication, and decreed that the motion for an issue out of chancery (under section 6246 of the Code) be overruled; that such issues of fact raised by the bill, answers and replication should be determined in favor of the complainant; that the injunction be perpetuated against the respondent, W. H. Elmore; that he make discovery of the amounts received by him for milk, within thirty days, etc.

The suit was abated as to H. M. Brawner, Jr., trading as Chestnut Farms Dairy.

The operation of the decree was suspended upon notice that respondent desired to appeal to this court, and an appeal and supersedeas were later awarded.

There are three assignments of error, which will be discussed in the order in which they are alleged in the petition.

1. The action of the trial court in overruling the plea raising the issue under section 6121 of the Code, as to whether the alleged contract was delivered, or was ever intended to be delivered to complainant.

2. The action of the court in declining to award an issue out of chancery upon motion of respondent, after all the evidence was taken.

3. The decree of the court upon the merits of the case.

[1, 2] (1) The plea in this case was filed by respondent under section 6121 of the Code, which provides that "a plaintiff in equity may take issue upon a plea, and either party may have such issue tried by a jury."

The issue sought to be raised for trial by jury, as a reference to the plea shows, was whether the pooling contract, admittedly signed by respondent, was ever intended to be delivered to complainant, or was delivered.

An issue for trial by jury, under this section of the Code, is entirely different from an issue out of chancery under section 6246 of the Code. The granting of an issue under the latter section, rests on the sound discretion of the court and its object is to inform the conscience of the chancellor, and he may disregard the verdict or discharge the jury before verdict.

The object of section 6121 is to determine the issue of fact raised by the plea, and the chancellor has no discretion about awarding the jury trial, and the ver-

dict when rendered, stands like any other verdict of a
jury where the right to jury trial is given, without dis-
cretion on the part of the court, and the verdict cannot
be disregarded.    Either party may have such an issue
tried by a jury.    *Towson* v. *Towson*, 126 Va. 640, 102
S. E. 48.

The sufficiency of the plea filed herein as stated, was
set for hearing by decree, and the chancellor overruled
it as insufficient, refused to permit a trial of the issue
by a jury, and the cause was heard on the bill, answer
and replication.

If the plea was sufficient, that is, if it stated matter
of fact sufficient, if true, to end the controversy in
favor of respondent, then respondent was entitled as a
matter of right, as heretofore shown, to have the issue
tried by a jury, unless the plea was, as is contended by
complainant, (a) overruled by the answer, (b) waived
by the amended answer, which put in issue the same
matter as that set up by the plea.    As we view it, it
will not be necessary to consider the further contention
of complainant, that (c) the plea did not set up suffi-
cient defense.

[3] (a) It is contended that, by filing an answer
which brought in issue the same matter as was made
an issue by the plea, the plea was thereby overruled.

Such authority is adduced upon this proposition,
among others Fletcher's Pleading and Practice, sec.
247, where it is stated that the plea is substantially
a reason or excuse of the defendant for not answering
the bill of complaint, and so, if the defendant answers
the bill, he waives the excuse for not doing so.

In *Souzer* v. *DeMeyer*, 2 Paige (N. Y.) 576, the
chancellor said: "It is a well settled principle of equity
pleading that the defendant cannot plead and answer
*  *  *  as to the same matter.    If he pleads to

any part of the bill, he asks the judgment of the court whether the matters of the plea are not sufficient to excuse him from answering so much of the bill as is covered by the plea. Therefore, if he answers as to those matters which by his plea he has declined to answer, he overrules the plea; *  *  "

Other authorities cited are, *Leacraft* v. *Demprey*, 4 Paige [N. Y.] 124; *Nat. Hollow Brake Beam Co.* v. *Interchangeable Brake Beam Co.* (C. C.), 83 Fed. 26, 29; *Hudson* v. *Randolph*, 66 Fed. 216, 13 C. C. A. 402; *Dakin* v. *Union Pac. Ry. Co.* (C. C.), 5 Fed. 665; Story's Equity Pleading, sec. 552; *Grant* v. *Insurance Co.*, 121 U. S. 105, 7 S. Ct. 841, 30 L. Ed. 905.

[4] It was also true, however, in England and in some of the States, that a defendant could not demur and plead, or demur and answer, to the same matter, for the reason, it was held, that the answer overruled the demurrer. But this rule, admittedly in force in England, was held in *Bassett's Admr.* v. *Cunningham's Admr.*, 7 Leigh (34 Va.) 406-7, not to be applicable in Virginia, so far as it applied to an answer overruling a demurrer. The reason given by the court for the difference in procedure in Virginia was that our statute (now section 6107 Code) allows the defendant, in an action at law, to plead as many "matters, whether of law or fact, as he shall think necessary for his defense; and it has been repeatedly decided that a defendant may plead and demur to the declaration." And then the court adds: "Why should we not extend this rule, by analogy, to proceedings in courts of equity?"

Professor Minor, in his Institutes, Vol. IV, Pt. 2, p. 1304, says: "In Virginia, indeed, a disposition has been exhibited to regard the statute above cited (6107), allowing as many several matters of law or fact to be pleaded as the defendant may think necessary, as

extending by analogy to the courts of equity, and as permitting, therefore, at one and the same time, in any case, an answer, demurrer and plea to the same matter in the bill, without the exercise of any discretion on the part of the court." Citing *Bassett* v. *Cunningham, supra*, he adds: "And such seems to have been the more recent view of the legislature. (V. C. 1873, ch. 179, sec. 1.)"

[5] This section of the Code of 1873 is now section 6373 of the present Code, and is as follows: "All things contained in any chapter under this title, not restricted by their nature, or by express provision, to a particular court, shall be the rules of decision and proceeding in all courts within this State."

We think, therefore, that it is established that whatever the rule is elsewhere, the *procedure*, in Virginia, is that a defendant may demur, plead and answer at the same time to the same matter in the bill. It really makes no difference whether the statute, section 6107, was extended by analogy to proceedings in courts of equity, or not, at least, since the decision in *Bassett's Admr.* v. *Cunningham's Admr., supra*.

[6] (b) The second error alleged also involves a question of procedure. It is a novel one in this State, but we think the general rule is that where a plea is overruled on demurrer and the defenses raised by the plea are covered by an answer, or an amended answer is filed covering the defenses raised by the plea, this would constitute a waiver of the plea. Thus in *Grant* v. *Insurance Co.*, 121 U. S. 105, Mr. Justice Blatchford, speaking for the court, said: "The ground on which the general term affirmed the order of the special term, overruling the pleas, is stated in the opinion of the general term * * * (McArthur & Mackey, & M. [D. C.] 117) to have been that the

second, third and fourth pleas, to which alone the
appeal related, raised defenses that were covered by
the answer of Grant. That answer distinctly sets up
the defense of usury, covered by the third plea, and
the defense of payment covered by the fourth plea.
\* \* \* We concur in the disposition made, for
the reasons thus stated, of these pleas. The defendant
has had under his answer the benefit of the defenses of
usury and payment set up in the third and fourth
pleas; and the rule that no plea is to be held bad only
because the answer may extend to some part of the
same matter as may be covered by the plea is not
applicable where the answer extends to the whole of
the matter covered by the plea.

"We think, therefore, that the respondent, in this
case, having filed an amended answer, embodying the
same defenses raised by the plea, after the court had
overruled the plea, waived his plea, and that it is not
necessary for us to pass upon the sufficiency thereof."

[7] 2. We are of opinion that the court did not err
in refusing an issue out of chancery upon the motion
for such an issue under section 6246 of the Code.

The granting of an issue out of chancery, under
section 6246 of the Code, upon the bill, answer, replica-
tion and depositions lies not within the arbitrary, but
within the sound judicial, discretion of the chancellor.
As heretofore stated, the object of an issue under this
section is to inform the conscience of the chancellor,
and the mere fact that there is a conflict of evidence
does not make it mandatory that such an issue be
granted.

Here, as already appears from the statement of the
facts so far, but as will more fully appear from a further
statement, the merits of the case are clear, and there
was no occasion for an issue. *Pryor* v. *Adams*, 1 Call
(5 Va.) 332, 1 Am. Dec. 533.

[8] The rule is well stated in Fletcher's Equity Pleading, sec. 618, as follows: "As a general rule, it (the court) has, however, the power of determining all questions of fact without resorting to this mode of inquiry, and it should not be employed except where the conflict of witnesses or the obscurity of evidence is such as to make it doubtful on which side the preponderance of evidence lies." Citing *inter alia, Williams* v. *Blakey*, 76 Va. 254; *Hord* v. *Colbert*, 28 Gratt. (69 Va.) 49; *Wise* v. *Lamb*, 9 Gratt. (50 Va.) 294.

There was no error in refusing the issue out of chancery.

[9] 3. The court did not err in deciding the issues of fact in favor of the complainant.

The membership of respondent in the association is not denied. The signing of the uniform pooling contract and its possession by the association are not denied. Under these circumstances, the burden of proving that the contract was never legally delivered is upon the respondent.

It is true that there is a direct conflict between the respondent and witnesses testifying in his behalf on the one side and W. H. Berry, who carried the pooling contract to respondent and secured his signature and other witnesses testifying on behalf of complainant, on the other, upon the question of the circumstances under which the contract was signed by Elmore. No analysis of this evidence, which is very voluminous, can be undertaken here. It must suffice to say that when all the evidence is weighed in the scales of reasonableness and common sense, and in the light of surrounding circumstances, which were no doubt the tests applied by the trial court, the preponderance is with complainant.

A fair idea of the conflict will be obtained from the

statement of the respondent as to the circumstances under which he signed the contract, on the one side, and from the statement of Dallas Berry, who carried the unsigned contract to the respondent, obtained his signature and conveyed it to the bank, on the other. Respondent testified in response to the question:

"Q. In your own way, Mr. Elmore, will you just tell all the circumstances leading up to and attending your affixing your name to that paper, to whom you gave it, and the purpose for which it went out of your possession?

"A. On the date that that paper was signed, Mr. R. L. Harrison and Mr. Dallas Berry came to my place with what they termed a special proposition, agreeing if I would sign this contract, this paper, they would place same in the National Bank of Herndon, to remain there until I gave my consent for its removal."

Dallas Berry testified in response to questions upon the same proposition:

"Q. Please state the circumstances leading up to that occasion and what transpired at the time said contract was signed.

"A. The board of directors voted to use this pooling contract, and in the winter of 1922 we got a great many men to sign the pooling contract at mass meetings, and some by going to see them on their farms.

"Q. Mr. Elmore, in his testimony in this case, in response to the question: 'State the circumstances leading up to and attending the execution of this paper,' says: 'On the date that paper was signed Mr. R. L. Harrison and Mr. Dallas Berry came to my place with what they termed a special proposition, agreeing if I would sign this contract, this paper, they would place same in the National Bank of Herndon, to remain

there until I gave my consent for its removal.' Please state anything that you wish to state in respect to that statement by Mr. Elmore.

"A. I did not have any such thought ever in my mind, or that I ever made any such statement to anybody."

The statement of respondent is not in accord with common sense or reason. There could have been no good reason or no good purpose served by securing respondent's signature to the contract and then placing it in bank until respondent said it should become effective. At least, the parties were not getting anywhere by indulging in such a proceeding.

If the contract which respondent had signed was not to become effective until he thereafter assented to it orally, then all he did was a nullity. That sensible men should waste their time so futilely, taxes the credulity of a court.

On the other hand, the contract was in writing. Respondent presumably read it and was acquainted with its provisions. One of its outstanding provisions was that the operation of the contract was conditional upon securing a sufficient number of signatures of members of the association to it to justify putting it in operation. That condition is set out in clause 15 of the contract as follows:

"15. It is further mutually agreed that this contract shall become operative when the board of directors of the association shall have determined that a sufficient supply of milk has been secured to justify operations hereunder and when notice of that fact shall have been mailed to the producer at his post office address herein specified, and shall continue for a period of three years therefrom and thereafter until terminated by notice in writing from either party hereto to the

other, between the 15th and 31st day of December of any year, that on the 15th day of January following this contract will be then determined."

If the condition which respondent says was attached to his signing the contract is not in direct conflict with this condition expressed in the contract, it is at least inconsistent with the purposes sought to be attained, and is destructive of those purposes.

Not only was respondent presumably acquainted with the contents of the contract and its purposes, but he was present at a meeting held in Herndon when Dallas Berry, then president of the association, made the proposition to those present that if they would sign the pooling contract it would be placed in the Herndon bank and remain there until signed by producers of 85% of the milk coming into Washington. Shortly prior to this a resolution had been adopted by the members of the association to the same effect. Respondent as well as Berry knew the purpose of the drive to secure signatures to the contract. If Mr. Berry could not get 85% signed up, his mission was a failure. If he could secure that number it was a success. If respondent's version of the understanding is correct, what he did that day had no bearing on Mr. Berry's mission and did not assist towards the 85% because it could under no circumstances be counted until and unless again assented to. If Mr. Berry's version is correct, it was just as effective for his purposes as if delivered without condition. In the one there was no mutual promise or obligation at all, under the other there was a mutuality of contract and obligation then existing.

The one is at utter variance with every word and letter in the contract signed, the other is in full conformity with it. The contract provided in terms that

this contract "shall become operative when the board of directors shall have determined that a sufficient supply of milk has been secured" which as shown had been officially construed by and communicated in writing to each member of the association to be 85% of the supply. The oral contract relied on by respondent was, in effect, to say: "This contract is no contract and never will be," and yet he signed the written agreement and omitted this, which he said was the only condition upon which he would ever have signed.

Moreover, the contract signed by respondent contained this clause: "It is hereby further stipulated that this contract and the constitution and by-laws comprise the entire contract between the parties and that it is not made upon any terms, conditions or representations other than as herein expressed, and the producer acknowledges that no agent, officer, or director of the association has any right or authority to make or consent to any terms, conditions or representations not herein expressed in writing." And yet respondent rests his whole defense upon a special verbal proposition made to him by Berry and Harrison, in the very teeth of this provision.

In addition to all this, on August 2, 1923, some months after the pooling contract was signed by respondent, he gave the association his note for $220 on which, written on the face thereof, appears this: "This note may be used by the said association for the purpose of being pledged by the board of directors thereof as collateral security for any loan that may be necessary and authorized by the said association for the purchasing, leasing, building or equipping of receiving stations (including the necessary real estate), or in any emergency, as decided by the board of directors of the said association, in the starting and operating of the pooling plan; but it shall not be used for any other purpose."

The record shows that the association contemplated erecting a receiving plant at Frederick, Md., to take all the surplus association milk. It further shows that these were accommodation notes signed by members only, at the rate of $10.00 per cow, and respondent had twenty-two cows in his herd, and they were to be used only for the purposes specified on the face of the note, one of which was to erect the plant at Frederick, in starting and operating the pooling plan.

It seems unnecessary to comment further upon evidence and circumstances corroborative of the contention of complainants that no such condition as respondent claims was attached to his signature of the contract. From a careful consideration of all the evidence, it seems to us that the chancellor could not have properly arrived at any other conclusion than that reached by him, and further that if he had directed an issue out of chancery and the verdict of the jury had been for the respondent, it would have been so against the weight of the evidence that his plain duty would have been to disregard it.

For the reasons assigned, we think the decree of the trial court should be affirmed.

*Affirmed.*