# Richmond

Eagle Lodge, Incorporated v. Arthur N. Hofmeyer.

June 16, 1952.

Record No. 3928.

Present, Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*D. Gardiner Tyler, Jr.* and *George E. Haw,* for the appellant.

*R. T. Armistead,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

This proceeding was instituted on December 13, 1948, by Eagle Lodge, Incorporated, hereinafter referred to as the appellant, against Arthur N. Hofmeyer, seeking an injunction against the defendant, his agents and servants from traveling over, trespassing upon, or using all roadways of the land of the appellant, known as Cary's, except a direct outlet road leading from appellee's land to a road called the Poplar Ridge Route. A temporary injunction was granted upon the allegations of the bill and the oral testimony of appellant; but was dissolved at a hearing on December 20, 1948.

On February 15, 1949, appellee filed his answer setting up the following defense:

"That this respondent and his predecessors in title have used the existing right of way continuously and exclusively for a period of more than twenty years and that the use has been made under a claim of right with the knowledge and acquiescence of the owners of Cary's."

On February 16, 1949, appellee asked for an issue out of chancery, based on the defense set up in his answer. Judge Frank Armistead, presiding as chancellor, granted his request on January 21, 1950. On April 28, 1950, Judge Armistead disqualified himself from further hearing the case, and Judge Brockenbrough Lamb was designated in his place and stead. At a pretrial conference on May 31, 1950, Judge Lamb vacated the decree of January 21, 1950, awarding an issue out of chancery, and ordered that the cause be set for hearing *ore tenus* before the court, without a jury, on September 25, 1950.

Thereafter, on September 7, 1950, the appellee tendered by mail the following plea and asked that it be filed:

"The said defendant Arthur N. Hofmeyer, by his attorney, comes and says that the road described in the complainant's bill of complaint, which said road leads from Cary's Gate by Cary's house and thence to Route 621 has been used and enjoyed by this defendant, adversely, under a claim of right, exclusively, continuously, uninterruptedly and with the knowledge and acquiescence of the owner of Cary's and that said use and enjoyment has continued for a period of more than twenty years. And this the said defendant is ready to verify."

Appellant objected to the filing of the plea. On September 15, 1950, after hearing argument of counsel, the chancellor allowed the plea to be amended by inserting before the word "adversely," the words "and his predecessors in title"; ordered the plea to be filed as a plea in bar under Virginia Code, 1950, § 8-213; and announced that a regular jury would be empaneled to try the issue. Appellant, without waiving its objection, filed its general replication.

On September 21, 1950, appellant renewed its motion to strike defendant's plea upon the grounds that appellee had falsely stated that it had formerly agreed to a trial of the issue by a jury; that only the chancellor should hear the evidence in order that he might properly exercise his right and discretion in

giving or withholding credit to a witness who had actually given false testimony at a former hearing before Judge Armistead; and that the plea was filed beyond the time limit prescribed by Virginia Code, 1950, § 8-121.

The motion was overruled, the court stating that the false testimony referred to, if any, was not heard by him. A trial was held upon the issue joined on the plea as amended. At the conclusion of the evidence of the appellee, the court overruled a motion to strike the evidence as insufficient to show that the road in dispute had been "used uninterruptedly, adversely, continuously for a period of more than twenty years."

In making his ruling, the chancellor said:

"The evidence in the case, as developed to this point that the well defined roadway in question, in location as it stands today has been in use since 1910 or for a period of about 39 years before this suit was brought. It has also been shown by the evidence that in origin the use of the road was permissive or by license of Smith who was the then owner of Cary's."

Over the objection of the appellant, the appellee was recalled and allowed to further testify. At the conclusion of all the evidence, the motion to strike the evidence was renewed and overruled.

Sundry instructions were offered by appellant and others given over his objection. Due exceptions were taken.

On September 27, 1950, after hearing the evidence, the instructions of the court, and argument of counsel, the jury returned a verdict "for the defendant, Arthur N. Hofmeyer, on his plea."

Appellant moved that the verdict of the jury be set aside for reasons theretofore stated, and upon the further ground that the verdict, at most, raised only a *prima facie* presumption of a lost grant, and it devolved upon the court to determine whether or not that presumption was rebutted by the evidence. After an adverse ruling, it moved that it be permitted to introduce additional evidence to rebut the *prima facie* presumption. The motion was overruled and the judgment entered on Jan. 15, 1951, in accordance with the verdict. The court rendered a written opinion expressly justifying its action; but expressed some doubt about several phases of the case, especially with reference to the propriety of one of its instructions to the jury.

Notwithstanding the foregoing, the appellant filed on February 2, 1951, additional depositions in support of its factual contentions. Defendant was not present at the taking of the depositions, and they were objected to on the ground that reasonable notice had not been given to him; that they were not signed by the witnesses; and that since the matter had been decided there was no issue pending before the court.

On the next day, appellant moved to vacate the final decree of January 15, 1951, upon the ground that the court had made erroneous statements to the jury with respect to the evidence. The court vacated the decree, it having been entered less than twenty-one days prior thereto, and continued the cause for further argument.

On March 14, 1951, the court permitted the appellant to file the depositions taken subsequent to the hearing of the cause as a part of the record; but held that "none of them are proper to be considered, either as after discovered evidence or otherwise." and adhered to its ruling theretofore made to enter judgment upon the verdict of the jury. Final judgment was entered accordingly.

The two real questions in this case are, first, whether the court erred in allowing the defendant to file his plea on September 15, 1950, and directing the issue thereunder to be tried by a jury under § 8-213, Code of 1950; and, second, whether the evidence justified the verdict of the jury that the appellee had acquired the prescriptive right to use the disputed road. These questions will be discussed in their order.

Code of 1950, § 8-121*, provides:

"A defendant in equity upon whom process has been executed shall file his answer or other defense in the court or in the clerk's office of the court in which the suit or proceeding is pending within ninety days from the day on which process has been returned executed, or if the bill shall not have been filed at that time, then within ninety days after the bill shall have been properly filed at rules, or after any amended or supplemental bill shall have been filed, unless after notice to the adverse party, and for good cause shown, additional time be given by the court, or the judge thereof in vacation, within which to file the same. After the lapse of such period of ninety days, or such additional time, if any such be granted, no answer or other defense shall be

---

* The case was not tried under Rules of Court effective February 1, 1950.

received except for good cause shown and upon payment to the complainant of his costs up to that time, or such part thereof as the court or judge shall deem reasonable, and unless the defendant will undertake to file his answer within such time as the court or judge shall direct, and submit to such other terms as the court or judge shall direct, for the purpose of speeding the cause; * * *."

The purpose of this section is to require an orderly and timely presentation of defenses in order to prevent delay in the prosecution of a suit. It is not intended to cut off the defendant from a full defense. The provision of the statute that delay in filing the defendant's pleas shall not be allowed, except for good cause shown, has been liberally construed. Its applicability rests within the sound judicial discretion of the trial court, it being impossible to lay down a rule which will be binding in all cases. *Worsham* v. *Nadon,* 156 Va. 438, 157 S. E. 560; *Stiers* v. *Hall,* 170 Va. 569, 197 S. E. 450; *Robins* v. *Massey,* 179 Va. 178, 18 S. E. (2d) 385.

The intendment of this statute is directed chiefly against permitting the defendant, by filing his defense after the limitation of time specified, to put the plaintiff to further proof than that already theretofore made; thus causing a delay or continuance because of matters put in issue for the first time. *Gray* v. *Francis,* 139 Va. 350, 124 S. E. 446.

Under the peculiar circumstances here, the controversy as to whether there was an original agreement to try the issue before a jury, the fact that the same issue was raised in the plea as set out in the answer and in the issue out of chancery, the change of trial judges, the delay in hearing the preliminary motions, and the lack of any evidence showing prejudice to the appellant all furnish good cause for the exercise of the discretion of the trial judge in determining whether or not the plea should be filed. Its filing was not made the ground, either for a continuance of the case, or postponement of the trial. It brought in no new issue requiring the plaintiff to make further proof than upon issues theretofore made. Moreover, when the judge designate set aside the order for the issue out of chancery, it gave the appellee the right to make his full defense under Code, § 8-213.

Code of 1950, § 8-213, provides that: "A plaintiff in equity

may take issue upon a plea, and either party may have such issue tried by a jury. ('Code, 1919, § 6121).''

The object of this statute is to determine the issue of fact raised by the plea, not to inform the conscience of the chancellor. The chancellor has no discretion about awarding the jury trial when the plea has been properly filed. It is a wholly statutory proceeding and entirely different from an issue out of chancery under Code, § 8-214. *Towson* v. *Towson,* 126 Va. 640, 646, 102 S. E. 48; *Elmore* v. *Maryland, etc. Producers Ass'n,* 145 Va. 42, 51, 134 S. E. 472; *Phillips* v. *Wells,* 147 Va. 1030, 1043, 133 S. E. 581.

The second question is one primarily of fact. A great deal of evidence was taken in the case, and much of it is conflicting, vague and unsatisfactory with reference to the use of the disputed roadway, but positive as to its origin. Witnesses were contradicted by each other and by their own statements given at different times. The memories of some of the more or less uneducated, especially the very old, were cloudy and confused. But out of the welter of confusion and contradiction, we believe the following to be a fair summary of the evidence.

The locale of the property involved is on a peninsula, generally bounded on the east by the Chickahominy river and on the west by Morris Creek, in Charles City county, Virginia, not far distant from Jamestown. The lands were settled in the early Colonial days of Virginia. Appellant's property, including two tracts known as Cary's and Gravel Hill, containing together approximately 1120 acres, was acquired in July, 1930, from the heirs at law of E. H. Smith. Smith obtained title to the two tracts of land April 30, 1898. Adjoining Gravel Hill on the south is the property of the appellee, known as Clay Bank, which he acquired from his father, John Hofmeyer on November 6, 1942. John Hofmeyer purchased Clay Bank from the widow and heirs of W. C. Blanks on April 19, 1929. Adjoining Cary's, the northerly tract of appellant, is a tract of land now or formerly owned by Braxton Haynes.

The several farms were occupied by the following tenants and residents during the years stated. Roland Haynes, brother of Braxton Haynes, became a tenant of Cary's about 1909 or 1910, and he lived there until his death in 1918. His widow, Eliza, resided there until 1944. Jim Blanks, brother of W. C. Blanks, lived at Gravel Hill with his family during the years

1910-1918. W. C. Blanks lived at Clay Bank until his death about 1907, and his widow and children continued to live there until the property was sold to John Hofmeyer in 1929. Braxton Haynes lived on his farm from 1910 to 1926. His widow and children remained there until 1944. The wives of Roland and Braxton Haynes were sisters. Roland and Braxton Haynes were also first cousins of Jim and W. C. Blanks.

It is shown that there was, for many years, a roadway from Clay Bank running across the Gravel Hill and Cary tracts, known as Poplar Ridge Route. It led to the Holdcroft-Williamsburg road, a public highway. According to a deed recorded in 1792, in the chain of title of the Gravel Hill and Clay Bank tracts, which were the same at one time, a ''cart road leading to Clay Bank,'' is described as a boundary line of Clay Bank. The boundary lines of Clay Bank, however, lie some distance from the entrance to the disputed roadway here.

A number of witnesses testified that Poplar Ridge had been generally used as the way of travel from Clay Bank to the public highway until 1929, and for sometime thereafter. Others said it had been used by tenants of Clay Bank and their visitors only once in a while after 1910, because it became impassable, for vehicles by reason of holes, quicksand, and a growth of brush and trees in the lane of travel. At the present time, it is undoubtedly in poor condition due to a lack of repair and infrequent use.

The controversy here revolves about the right of the appellee to use an entrance lane running east from Poplar Ridge Route to the dwelling house of Cary's, and thence continuing northerly on a road across the lands of Cary's to the tract of Braxton Haynes. There was a gate at the intersection of the entrance lane with Poplar Ridge when Roland Haynes became a tenant of Cary's. It was the only way of travel from Cary's to the Poplar Ridge Route, and thence northwesterly to the latter's junction with the Holdcroft-Williamsburg road. About 225 yards distant from its entrance gate there was an old road opened in 1910, occasionally used until 1929 and then plowed up, which led from Poplar Ridge to the garden gate of Braxton Haynes. The only road from Cary's to Haynes' place was by way of the entrance lane to Cary's and thence along Poplar Ridge to the road entering Haynes' garden gate.

In 1934-35, a modern State highway was constructed, leading to Braxton Haynes' land. Prior to that time, there was an-

other road leading from Haynes' farm, which made a junction with Poplar Ridge Route some distance from the entrance gate to Cary's. There seems to be little doubt that the disputed road,—that is, the entrance lane to Cary's and thence across Cary's to the land of Braxton Haynes—had been quite generally used by tenants of Clay Bank, Gravel Hill, Cary's and Braxton Haynes' tract, their relatives, friends and visitors, for a period of approximately thirty-nine years before this proceeding was instituted.

In October, 1944, appellant erected and locked a gate across the entrance lane to Cary's at its intersection with Poplar Ridge. The defendant thereafter cut the lock of the gate; but when charged with doing so denied it. Subsequently, he confessed that he did break the gate and its lock, and had testified falsely to the contrary at the hearing to dissolve the temporary injunction. Following the breaking of the locked gate, this controversy over the right of appellee to use the disputed road arose and this proceeding was subsequently instituted.

This brings us to the question of the origin of the disputed road. In 1909 or 1910, after Roland Haynes became a tenant of Cary's, he and his brother, Braxton Haynes, requested E. H. Smith, the owner of Cary's, to allow them to cut the division fence between Cary's and Braxton Haynes', and run a road to the latter's land, upon the ground that it would be more convenient for everybody living on the adjoining farms. Smith granted their request, and that part of the disputed road leading north from the entrance lane into Cary's, beginning at a point near the house of Cary's, was constructed going over the field of Cary's and through the division fence to the land of Haynes. Sometime later another roadway farther to the east was run from the entrance lane to the same opening in the fence. The latter road was used until 1929, and then plowed up. After the first road connecting the farms was constructed, the families of Roland and Braxton Haynes, their neighbors and kinsmen used it frequently. The tenants of Clay Bank also used it in visiting their cousins at Cary's and Braxton Haynes', and in traveling through Haynes' farm to the old road forming a junction with Poplar Ridge. It also appeared that other persons traveling to the several farms for pleasure or business used the disputed road at their convenience, instead of going by way of Poplar Ridge.

Only two of the five heirs of W. C. Blanks, owners of Clay

Bank, appeared and testified, and they said they had never claimed a way along the disputed road as a matter of right. Some of the members of the families of the several tenants said that they asked permission from time to time when they used the road. Others said they used it whenever they wanted to go and come, without asking permission. There was no injury done the road by the travel mentioned; no interference with the cultivation of the lands; nor any damage to the property in any way.

The privilege of using the road was not disputed, nor was a legal right to its use asserted until after the acquisition of Clay Bank by the defendant's father. E. H. Smith, the owner of Cary's, made no complaint about the use of the road over his property. He knowingly permitted his tenants, their kinsmen and neighbors to make a friendly and neighborly use of any road leading to or from his house. He claimed for himself only a right of way from Cary's over the Poplar Ridge Route, and instructed his family to get permission always when they traveled over Braxton Haynes' property.

Mrs. Eliza Haynes, wife of Roland Haynes, who lived at Cary's from 1909 to 1944, a witness called on behalf of defendant, testified as follows with respect to the origin of the disputed road and to the use of it by those living at Clay Bank:

"Q. Do you know when the road which goes from Cary's gate around to Cary's house, and then up to Brax Haynes' house was built?

"A. Yes, they made that road directly after we went there. So it would be convenient for everybody to travel.

"Q. That would be then around 1909 that that road was built, is that right?

"A. It must have been.

"Q. Who actually built the road, do you know?

"A. Well, it was Brax and Roland that built the road, because Mr. Smith couldn't stay here to help put the road in there. You know, they just made it good so everybody could go over it.

"Q. That road that is in the controversy here leading from the old gate through the fields of Cary to Brax Haynes: I believe you testified that was opened up after you came there?

"A. It was.

"Q. Did Mr. Elmer Smith authorize the opening of it?

"A. He did.

* * * *

"Q. Do you recall anything about the circumstances of that authorization, what Mr. Smith did say or do?

"A. Yes, because Roland said to him, we were living there on adjoining farms, and how about just—It was just a little two-strand wire across there, he said how about cutting that down and making the road through here, and it would be convenient for everybody. He said O. K., so they did it.

"Q. It was opened up then for your convenience to get to Mr. Brax Haynes'?

"A. It was convenient for everybody that wanted to go through down to that section, down to Clay Bank.

"Q. Was anybody there from Clay Bank at the time that Mr. Smith told Roland, Mr. Roland Haynes, to open it up?

"A. No, I don't think so.

"Q. How did the members of the Blanks family know that road was opened?

"A. How did they know it was opened?

"Q. Who told them?

"A. Well, because they used to come back and forth up to my sister's place, used to come back and forth up home. We were all friends, we always had friends wherever we ever lived, and wherever it was a road everybody traveled it.

"Q. They used it as a neighbor would do, didn't they, used it as a neighbor? They came to see you?

"A. I never told them—

"Q. They came to see you while you were living there?

"A. Yes, and went to see my sister.

"Q. Went to see your sister?

"A. Yes, sir, and on out anywhere they wanted to go.

"Q. Wasn't it a great convenience for you, Mrs. Roland Haynes and your family, to use that road to go to see your brother and go out? Wasn't it convenient?

"A. It was convenient, and I will tell you it was the only road we had to go. You couldn't go the other way, and you certainly wouldn't go around your elbow to get to your thumb.

"Q. It was entirely agreeable with Mr. Smith that these people used that road, people down at Clay Bank, used that road, wasn't it?

"A. Yes.

"Q. After that road was opened did Mrs. Blanks and members of her family, including Mr. Hatch and others that lived at

Clay Bank ever use that road to interfere with your farming operations?

"A. No, they always came up to the gate, came on through down there, went on through Brax's. Never bothered any of my things or me or nothing.

"Q. I will ask you whether Mrs. Willie Blanks, Mrs. Hatch or her husband, or any of the Blanks children, of Mrs. Minnie Blanks, ever used that road across the fields of Cary to Brax Haynes' in a hostile manner?

"A. What do you mean?

"Q. Did they demand that they use it, come in there and say 'I have got a right to use this, and I will go through whether you let me or not?'

"A. Didn't have to do that, because they always used it. No one ever said you couldn't, and no one ever said you could. * * * They were welcome to use it."

Mrs. Elizabeth Smith, widow of E. H. Smith who died in 1920, testified that Roland Haynes and Eliza Haynes were, in reality, caretakers and protectors of the property of Smith; that they were authorized to permit their kinsmen and neighbors to make friendly and neighborly use of any road leading to or from the house on the property, so long as the use did not interfere with the land or its crops; and that she had never heard any report or notice that any person was using any roadway on the property under a claim of right, hostile and adverse to the owner.

Mrs. Esther Smith Morris, daughter of E. H. Smith and his heir at law, said that she likewise never heard of anyone making a claim of right or a hostile use of the roadway across any part of Cary's to go to the land of Haynes.

J. W. Avery, 64 years of age, a lumber dealer, who had formerly lived at Clay Bank and knew the W. C. Blanks family quite well, said he had never heard any of them make a claim of right to travel the disputed roadway.

Robert Jennings, who lived for a time at Clay Bank soon after the roadway was opened, said that when they (the family of W. C. Blanks) traveled through Cary's to Haynes' place, they did so by permission of the owners of the land.

The law of this State upon the subject of acquisition of a private way by prescription, as between adjoining landowners, has been under review by this court from an early date, and may be regarded as well settled. Where it appears that there has

been an open, visible, continuous, uninterrupted use of a road across the land of another, for at least twenty years, the use will be presumed to be under a claim of right and places upon the owner of the servient estate the burden of rebutting this presumption by showing that the use was permissive and not under claim of right. *Powell* v. *Magee,* 191 Va. 315, 321, 60 S. E. (2d) 897.

In Virginia and elsewhere generally it may be said that the law is jealous of a claim to an easement, and the burden is on the party asserting such a claim to prove its elements clearly. *Witt* v. *Creasey,* 117 Va. 872, 874, 86 S. E. 128; 28 C. J. S., Easements, § 68, page 734.

In the early case of *Nichols* v. *Aylor,* 7 Leigh (34 Va.) 546, 563, it was said:

"In cases of rights of way etc. the original enjoyment cannot be accounted for, unless a grant has been made; and therefore it is, that for long enjoyment such grants are presumed. But even in these cases, evidence to rebut such a presumption would be admissible."

The presumption which arises from long enjoyment under the doctrine of a lost grant is one of fact, and may be rebutted by evidence that no claim had been made. *Reid* v. *Garnett,* 101 Va. 47, 43 S. E. 182; *Williams* v. *Green,* 111 Va. 205, 68 S. E. 253; *Wade* v. *Moore,* 139 Va. 765, 124 S. E. 201.

In *Reid* v. *Garnett, supra,* beginning at page 49, Judge Buchanan said:

"Where a landowner keeps open and uses a way, its enjoyment and use by another in common with the public must generally be regarded as permissive or under an implied license, and not adverse, unless there be some decisive act on the part of that other indicating a separate and exclusive use under the claim of right." (Cases cited).

The above statement was approved in *Graham* v. *Thompson,* 143 Va. 29, 129 S. E. 272. Quoting from it, we said:

"If it were once understood that a landowner by allowing his neighbors or the public to pass through his lands without objection over a passway which he himself used, would thereby, after the lapse of twenty years, confer on such neighbors, or any of them, the right to compel the way to be kept open for his or their benefit and enjoyment, a prohibition against all such travel would immediately ensue." (143 Va., page 34).

Still later in *Wall* v. *Landman,* 152 Va. 889, 148 S. E. 779, Judge Prentis made the following pertinent statement on page 895:

"We believe it to be perfectly well settled that where the owner of land opens a way thereon for his own use and convenience, the mere use by his neighbor under circumstances which neither injures the way nor interferes with the owner's use of it, in the absence of some other circumstance indicating a claim of right, will not be considered as adverse, and will never ripen into a prescriptive right. In order to ripen into a prescriptive right, the claim to the use of the way must be adverse—that is, not accorded as a mere accommodation, but asserted under a claim of right hostile to the rights of the owner of the servient estate, so as to expose the claimant to an action if his claim is not well founded. If it be fairly shown that the use is permissive in its inception, it will never by mere lapse of time ripen into a hostile right. *Gaines* v. *Merryman,* 95 Va. 660, 29 S. E. 738; *Reid* v. *Garnett,* 101 Va. 47, 43 S. E. 182; *Williams* v. *Green,* 111 Va. 205, 68 S. E. 253; *Landrum* v. *Tyler,* 126 Va. 600, 101 S. E. 788; *Davis* v. *Wilkinson,* 140 Va. 672, 125 S. E. 700; *Totten* v. *Stuart,* 143 Va. 201, 129 S. E. 217."

In *Rives* v. *Gooch,* 157 Va. 661, 668, 162 S. E. 184, Mr. Justice Hudgins, now Chief Justice, said: "In the face of positive evidence showing permission or license, presumption of a right, or grant, disappears. A prescriptive right will not arise from the permission of the owner. It has been repeatedly held that the use of the land of another for any length of time, merely by permission, will not ripen into title."

To the same effect see *Kent* v. *Dobyns,* 112 Va. 586, 587, 72 S. E. 139; *Pruitt* v. *Shafer,* 137 Va. 658, 667, 120 S. E. 275; *Davis* v. *Wilkinson,* 140 Va. 672, 125 S. E. 700.

In *Clatterbuck* v. *Clore,* 130 Va. 113, 120, 107 S. E. 669, it is said: "In accordance with numerous decisions of this court, it is essential to the acquisition by prescription of an easement of a private right of way over the lands of another, that the use of the way, however long continued, must, for the prescriptive period of twenty years, have been 'a proprietary use, exercised under some claim which is independent of the claims of all others and not dependent for its enjoyment upon similar rights in others.' *Landrum* v. *Tyler,* 126 Va. 600, 101 S. E. 788."

In 28 C. J. S., Easements, § 14, d (2), page 656, in discussing permissive use, it is said:

"Nevertheless, if a use begins as a permissive use it is presumed to continue as such, and in order to transform it into an adverse one there must be a distinct and positive assertion of a right hostile to the rights of the owner, and such assertion must be brought to the attention of the owner, and the use continued for the full prescriptive period under the assertion of right, excluding the time under which the user was permissive; * * *."

See also 17 Am. Jur., Easements, § 67, page 978.

The burden was upon the defendant to show that he and his predecessors in title had used the disputed roadway adversely, under a claim of right, for twenty years. Such use must have occurred between 1910 and November, 1944, as the roadway was blocked with a locked gate in the latter year. It is undisputed that appellee's predecessors in title used the roadway. However, the evidence clearly shows that the road was opened by the act and authority of the owner of the land; that the origin of its use was under an implied, if not an express, permission; that the acts and the testimony of the predecessors in title of defendant negative any adverse or hostile user under a claim of right; and that there was no change of circumstances or conditions in connection with the properties involved, or in the use made of the roadway between 1910 and 1929. Under the facts disclosed, such use by mere lapse of time did not ripen into a hostile right.

A fair summary of the evidence presents the following picture:

The three tracts, Clay Bank, Gravel Hill and Cary's, are located in a remote, sparsely settled area which was accessible to the outside world only by boat or by way of Poplar Ridge Route. The dwelling houses on the three tracts are east of Poplar Ridge. Outlet roads run off from Poplar Ridge to each of the dwellings. Braxton Haynes' tract had an outlet to Poplar Ridge which was abandoned about the year 1929. This tract had access also to another road on the east which connected with Poplar Ridge some distance to the north of the entrance gate to Cary's.

In 1909 or 1910, the owners of Cary's and the Haynes' tracts gave express permission for the construction of that part of the disputed road which runs from Cary's to Haynes' for the bene-

fit and convenience of the tenants and residents of the two tracts. The permission carried an implied license to the kinsmen and neighbors of the occupants of the two tracts to use the road for the convenience and accommodation of all concerned. When that portion of Poplar Ridge immediately north of the entrance lane to Cary's got in poor shape for travel, the tenants of the several farms and their relatives used the disputed roadway to go through Haynes' place to the road on the east, and thence on to its connection with Poplar Ridge until the construction of Route No. 621 in 1934 or 1935. Thereafter, the new road was used. No harm was done to the farms of the several land-owners and no claim of legal right or adverse use was asserted. There was no objection voiced against such use and the owners and tenants of Clay Bank were, in the language of Eliza Haynes, "welcome to use it."

The adjective "welcome" in ordinary and common acceptation, and according to Webster's International Dictionary, 2d Ed., Unabridged, means "Free or willingly permitted, as to do, to have, or enjoy, anything." As a noun, it is defined as "A cordial or kindly greeting to, or reception of, a guest or newcomer." It implies cordial and friendly permission or license, the privilege to use or enjoy the thing involved.

There was no assignment of error to the refusal of the court to grant a new trial on the ground of after-discovered evidence. The appellant was not entitled to have the depositions taken on January 31, 1951, after the hearing of the cause, filed or considered either in the court below, or here. Virginia Code, 1950, sec. 8-308. The costs of their taking and printing should not be assessed against the defendant. They must be borne by the appellant.

Our conclusion is that the verdict of the jury is plainly contrary to the evidence because use of the disputed road was permissive in its origin, and continued permissive, without any change in circumstances and conditions, in connection with the lands involved, at least until May 1929, when Clay Bank was acquired by the father of the defendant. Consequently, the verdict must be set aside, and the decree approving it reversed. The facts before us being of such a nature, in the opinion of this court, as to enable us to attain the ends of justice, it becomes our duty to decide the case on its merits and enter final decree for the appellant. Virginia Code, 1950, sec. 8-493.

In this situation, it becomes unnecessary to discuss the errors assigned to the instructions, particularly to instruction No. 2, which, as the trial judge says "is somewhat inadequate in covering an essential phase of the case."

A final decree accordingly will be entered here enjoining and restraining the defendant, Arthur N. Hofmeyer, his heirs and assigns, agents and employees, from traveling over, trespassing upon, or using the road described in the complainant's bill of complaint, which leads from Cary's entrance gate to Cary's house, and thence across Cary's field to the lands now or formerly belonging to Braxton Haynes.

Appellant shall recover the costs of this proceeding, save and except the cost of taking and printing the depositions of January 31, 1951.

*Reversed and final decree.*